# Richmond.

## A. E. Ewell v. W. R. Boutwell, President of Virginia Pilots Association, and Virginian and Pilot Publishing Company.

### March 20, 1924.

### Absent, Kelly, P.

1. Libel and Slander—*Candidate for House of Delegates—Statements in Paper Held Actionable.*—The instant case was an action for libel by a candidate for the House of Delegates who, as a member of the previous house, had introduced a bill proposing certain amendments to the then existing pilotage laws. The statements alleged to be libelous referred to the "destruction of the pilots and wholesale smuggling of whiskey and dope;" "forces other than honest purposes figure in this vicious attack upon the pilots;" to the purpose of several unscrupulous "rich men" to lower the personnel of the pilotage service so as to render it possible to engage in the smuggling of whiskey and dope; that a millon dollars of New York money was backing the movement, and there were other statements of a like character.

   *Held:* That the words published imported moral turpitude and were actionable if the alleged libelous publication pointed to the plaintiff as one of the persons referred to.

2. Libel and Slander—*Averments by Way of Inducement, Colloquium, Imputation, and Innuendo.*—No averment by way of inducement, colloquium, imputation, and innuendo, can extend or enlarge the libel, the only purpose of such averments being to show or elucidate the meaning of the words, but never to add thereto any additional meaning which is not by fair interpretation included therein.

3. Libel and Slander—*Necessity of Reference to the Plaintiff.*—In an action for libel, it is fundamental that the plaintiff must himself have the right to sue. However actionable the words may be, unless they refer to the plaintiff, he cannot maintain an action therefor.

4. Libel and Slander—*Libel Directed Against a Group—Right of Member of Group to Sue.*—If a class or group defamed is a very large one, and there is little or nothing which applies to the particular person who brings the action, his right of recovery will generally be denied.

On the other hand, if the language employed is directed against a comparatively small or restricted group of persons, then any member thereof may sue.

5. LIBEL AND SLANDER—*Libel Directed Against a Group—Candidate for House of Delegates—Case at Bar.*—The instant case was an action by a candidate for the House of Delegates who, as a member of the previous house, had introduced a bill proposing certain amendments to the then existing pilotage laws. The libelous matter referred to a group described as "wholesale smugglers of whiskey and dope;" and that it was the purpose of several unscrupulous rich men, who see their opportunity in this attack and are contributing thereto, to so lower the personnel of the pilotage service as to render it possible to engage in the smuggling of whiskey and dope on a large scale. That a large class of persons were referred to in the publication was manifest.

  *Held:* That in the absence of an averment of facts or circumstances from which it could be fairly inferred that persons reading the article would conclude therefrom that plaintiff was conspiring and co-operating with the men referred to in the publication, plaintiff had not alleged a cause of action.

6. LIBEL AND SLANDER—*Reference to Plaintiff—Innuendo.*—A plaintiff cannot by a formal allegation of his declaration that the words complained of were spoken of and concerning him extend the meaning of the words so as to make them applicable to himself, unless the language, by fair interpretation aided by innuendo, shows that it was in fact applicable to him.

7. LIBEL AND SLANDER—*Words Must Refer to Plaintiff—Innuendo.*—The defamatory words must refer to some ascertained or ascertainable person, and that person must be the plaintiff. If the words used really contain no reflection on any particular individual, no averment or innuendo can make them defamatory. An innuendo cannot make the person certain which was uncertain before.

8. LIBEL AND SLANDER—*Reference to Plaintiff—Case at Bar.*—In the instant case the words sued on, fairly construed, did not point directly to the plaintiff individually, nor to him as a member of a group or class. There was no averment of fact from which it could be fairly inferred that the libelous matter was written and printed of him, supplemented as they were by the averments of the declaration, and, if the words fairly construed and so supplemented did not in fact point to plaintiff, he could not extend their meaning. It is the words published that are actionable. Plaintiff failed to show by any circumstantial allegation of fact that he was, or could have been by any one else supposed to be, a member of any group or class to whom moral turpitude was imputed by the publication.

Error to a judgment of the Circuit Court of the city of Norfolk, in an action of trespass on the case. Judgment for defendants. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*Joseph T. Lawless,* for the plaintiff in error.

*Hugh W. Davis* and *Willcox, Cooke & Willcox,* for the defendants in error.

PRENTIS, J., delivered the opinion of the court.

This is an action for common law libel, in which the trial court sustained a demurrer to the second count of the declaration and gave judgment for the defendants. The original declaration also contained a count for insulting words, under the Virginia statute, but upon motion of the plaintiff that count was struck out and he relied solely upon the second count of his declaration. Omitting the formal introduction, it reads thus: "That before the committing of the grievances by the said defendants, as hereinafter set forth, he had been elected by the duly qualified voters of Princess Anne county, State of Virginia, as a member of the House of Delegates of the State of Virginia, and had faithfully discharged his duties as such at the session of 1920 last preceding, and had introduced and advocated in said body legislation, proposing certain amendments to the then existing pilotage laws of the State of Virginia; and that then, to-wit, on the said 30th day of July, 1921, he was a candidate to succeed himself as a member of the House of Delegates for said county and State, and as such had publicly declared his intention of introducing

again a similar bill, if re-elected, proposing certain
changes in said pilotage laws, and had openly and pub-
licly declared his purpose to urge the enactment of the
same, if re-elected, and had made the same the one
issue of his campaign.

"And the plaintiff says that said defendants well
knowing the premises, but contriving and wickedly and
maliciously intending to injure said plaintiff in his
good name, fame and credit, and to bring him into
public scandal, infamy and disgrace, and to use, harass,
oppress and impoverish and wholly ruin said plaintiff,
and cause it to be suspected and believed by and among
said plaintiff's neighbors, the qualified voters of said
county and State in the election then pending and to
be held on, to-wit: the_____day of_____191_____,
and other good and worthy citizens of this Common-
wealth, that said plaintiff had been and was guilty
while a member of said House of Delegates of betraying
his public trust as such and of having dishonestly, il-
legally and for a money and other illegal, dishonest and
dishonorable considerations, introduced in said House
of Delegates and of having unethically, dishonestly and
illegally urged the enactment thereof, of said certain
legislation which had for its object certain amendments
of the present pilotage laws of the State of Virginia,
did, on, to-wit: the 30th day of July, 1921, cause to be
inserted in a full page conspicuously displayed adver-
tisement in the Virginian-Pilot, a daily newspaper of
large, to-wit: forty-five thousand copies daily circula-
tion in said county and elsewhere (which said news-
paper is owned, controlled and published by said de-
fendant, Virginian-Pilot Publishing Company (a corp-
oration), the following amongst others, false, scandal-
ous, malicious and defamatory libels of and concerning
said plaintiff, which said words were understood by the

readers of the same generally in said city, county and
State to refer to and have been written of and concern-
ing the plaintiff and which in fact were so written and
published: '*Destruction of the Pilots and Wholesale
Smuggling of Whiskey and Dope,*' (meaning thereby
that said plaintiff by said proposed legislation had in-
tended and still does intend, if re-elected, to destroy the
Pilots' Association, of which said defendant, W. R.
Boutwell, is a member and of which he is president, for
the purpose of illegally smuggling into this State whis-
key and dope [by which latter term is meant narcotic
drugs] and illegally selling and causing the same to be
illegally sold to the people of this and other States.)
'*We repeat that any one with a modicum of gray matter
can see that forces other than honest purposes figure in
this vicious attack upon the pilots*' (meaning thereby that
plaintiff had been actuated and would again be ac-
tuated if re-elected by a dishonest purpose in having
proposed and in again proposing said legislation and
was and had been engaged in an illegal, dishonest and
dishonorable conspiracy against said pilots for the pur-
pose aforesaid; and that he had made and would again
make, if re-elected, a depraved, corrupt and evil attack
on said pilots in furtherance of said conspiracy and pur-
pose). '*We believe, however * * that the public
should have this angle of attack upon the pilots. We have
been informed that, as far as can be ascertained, it is the
purpose of several unscrupulous "rich men" who see their
opportunity in this attack and are contributing thereto,
to so lower the personnel of the pilotage service as to render
it possible to engage in the smuggling of whiskey and
dope on a large scale—that there is $1,000,000 to $2,000,-
000 to be made out of it annually, but that the scheme can-
not be effective under the present system of watchfulness by
the customs authorities and pilots who are in constant*

*co-operation with them*' (meaning thereby that plaintiff
had been and was then engaged in an illegal, dishonest
and dishonorable scheme or conspiracy with certain rich
men, through said proposed amendments to said pilotage
laws, to smuggle whiskey and dope [meaning narcotic
drugs] into the State and thereby illegally to make
money to the extent of from one million to two million
dollars annually). *'This report comes from a source
sufficiently prominent to give it due credence, and we be-
lieve implicitly that such plot is afoot'* (meaning thereby
that plaintiff was and is a party to an illegal, dishonest
and dishonorable plot to destroy said pilots by said
proposed legislation and to do the illegal things above
mentioned). *'Other sinister motives. We have for a
long time been cognizant of several sinister motives, chief
among which is State politics on a major basis—destruc-
tion of the present system of pilotage necessarily preceding
creation of the most powerful political machine that has
ever threatened to curse Virginia'* (meaning thereby that
plaintiff's motive in behalf of said proposed legislation
was malicious, base and wrongful, that he was and is
engaged in a dishonest, dishonorable and illegal plot
or conspiracy designed to bring dishonor on the Com-
monwealth of Virginia which he represented and sought
again to represent). *'New York money against the
pilots. During the last session of the General Assembly
of Virginia, during which the pilotage fight raged with a
bitterness surpassing that of any contest during the past
quarter of a century'* (meaning thereby the contest on
the said proposed legislation), *'we were informed that
New York money was backing the fight against the pilots*
(meaning thereby that plaintiff was a party to the il-
legal use of money contributed by persons in New York,
in furtherance of said plot, scheme or conspiracy, to
secure the enactment of his bill into law) *'and the lavish*

*display of (to say the least) unethical methods which were being employed'* (meaning thereby that plaintiff employed dishonorable and disreputable methods to secure the enactment of said proposed legislation). *'We then had reason to believe that report and are now in possession of a signed statement that $1,000,000 of New York money (as a private undertaking) was backing the movement and this by the declaration of one who was actively engaged in the passage of the Ewell bill'* (meaning thereby that plaintiff employed dishonorable and improper use of money, contributed by persons in New York, to secure the enactment of his bill into law and also to a conspiracy or scheme to use the same to illegally and improperly destroy said pilots for the purpose of smuggling into the State for illegal sale whiskey and dope (meaning narcotic drugs). *'We were also subsequently informed by some who had actually participated in the fight against the pilots* (meaning thereby those who had favored said proposed legislation) *that they had withdrawn because of the unscrupulous and disgusting methods which were being employed by some'* (meaning thereby the plaintiff, among others, had resorted to dishonest and dishonorable means to secure the enactment of said proposed legislation) *'in support of the measure'* (meaning thereby said Ewell Bill)."

(The words of the publication declared on are in italics.)

[1] A number of incidental questions have been discussed by the learned counsel, but it seems to be conceded, and if not conceded is certainly true, that the only fairly debatable question presented here is whether or not the alleged libelous publication points to the plaintiff as one of the persons referred to, who are therein accused of moral turpitude, so as to give him a right of action. That the words published import

moral turpitude and are actionable cannot be questioned.

[2] The plaintiff relies upon the averments of his declaration by way of inducement, colloquium, imputation and innuendo, while the defendants contend that as the libelous matter does not by name or otherwise cast any imputation upon the plaintiff, and that even as aided by the averments it cannot be fairly construed to refer to him, therefore he has no cause of action. The general rule is conceded to be that no averment can extend or enlarge the libel; that the only purpose of such averments is to show or elucidate its meaning, but never to add thereto any additional meaning which is not by fair interpretation included therein.

[3,4] Of course, it is fundamental that the plaintiff must himself have the right to sue. However actionable the words may be, unless they refer to the plaintiff, he cannot maintain an action therefor. This has been well illustrated by a number of cases in which the courts have had to determine whether the plaintiff belonged to the class or group which has been defamed. If the class or group involved is a very large one, and there is little or nothing which applies to the particular person who brings the action, his right of recovery will generally be denied. Courts have distinguished between classes and groups, applying the word "group" to a small number of persons, of whom the plaintiff is clearly one. So distinguishing between "class" and "group," it has been held that a charge of cowardice against a whole army, without specifying individuals, will not entitle a single soldier to maintain an action therefor; and that an attack upon winesellers is insufficient to enable a single wineseller to recover damages when there was nothing which could be construed to show that it was intended to be applied to the plaintiff personally. Such instances could be multiplied.

On the other hand, if the language employed is directed towards a comparatively small or restricted group of persons, then any member thereof may sue. For instance, charges against a public board with a few members may support an action for damages to a single member of that board; and so libelous language against the verdict of a jury may be the subject of an action by a single member of that jury. 17 R. C. L. 375, section 127.

The subject has been annotated in 23 L. R. A. (N. S.) p. 726, and is there thus epitomized:

"Admitting or conceding that the language used would be libelous if it had been directed at the plaintiff personally, is it actionable when directed impersonally at a class or group to which he belongs? It may be said generally, that if the language is so used as unerringly to point to plaintiff, his right of action is not affected by the fact that it is also applicable to others; and, although the language may not on its face refer to the plaintiff, he may maintain his action if he can establish its application to himself. But if there is nothing in the language employed which, by proper inducement or colloquium, can be given personal application to the plaintiff, he has no right of action." *Comes* v. *Cruce*, 85 Ark. 79, 107 S. W. 185, 14 A. & E. Ann. Cas. 327; *Hardy* v. *Williamson*, 86 Ga. 551, 12 S. E. 874, 22 Am. St. Rep. 479; *Lewis* v. *Soule*, 3 Mich. 514; *McGraw* v. *Detroit Free Press Co.*, 85 Mich. 203, 48 N. W. 500; *Watson* v. *Detroit Journal Co.*, 143 Mich. 430, 107 N. W. 81, 5 L. R. A. (N. S.) 480, 8 A. & E. Ann. Cas. 131; *Merrill* v. *Post Pub. Co.*, 197 Mass. 185, 83 N. E. 419; *Stewart* v. *Wilson*, 23 Minn. 449; *Kenworthy* v. *Journal Co.*, 117 Mo. App. 327, 93 S. W. 882; *Miller* v. *Maxwell*, 16 Wend. (N. Y.) 9; *Hauptner* v. *White*, 81 App. Div. 153, 80 N. Y. Supp. 895.

The annotator deduces these rules, which appear to be well supported by the cases:

"1. If defamatory words are used broadly in respect to a general class of persons, and there is nothing that points, or by colloquium or innuendo can be made to apply, to a particular member thereof, such member has no right of action.

"2. But if the language is employed toward a comparatively small group of persons, or a restricted or local portion of a general class, and is so framed as to make defamatory imputations against all members of the small or restricted group, any member thereof may sue.

"3. On the other hand, if the words used in respect to the small or restricted group expressly but impersonally and indefinitely refer to one or more of the several members thereof, one of the members, in order to maintain his action, must establish the application of the language to himself."

[5, 6] Applying these rules to the question presented, and considering primarily the words of the publication apart from the plaintiff's interpretation of them, we find that the libelous matter refers to a group described as "wholesale smugglers of whiskey and dope;" that it "is the purpose of several unscrupulous rich men, who see their opportunity in this attack and are contributing thereto, to so lower the personnel of the pilotage service as to render it possible to engage in the smuggling of whiskey and dope on a large scale—that there is $1,000,000.00 to $2,000,000.00 to be made out of it annually, but that the scheme cannot be effective under the present system of watchfulness by the customs authorities and pilots who are in constant co-operation with them;" that "this report comes from a source sufficiently prominent to give it due credence, and we

believe implicitly that such plot is afoot." Continu-
ing: "Other sinister motives. We have for a long
time been cognizant of several sinister motives, chief
among which is State politics on a major basis—de-
struction of the present system of pilotage necessarily
preceding creation of the most powerful political ma-
chine that has ever threatened to curse Virginia."
Continuing: "New York money against the pilots.
During the last session of the General Assembly of Vir-
ginia, during which the pilotage fight rages with a bit-
terness surpassing that of any contest during the past
quarter of a century, we were informed that New York
money was backing the fight against the pilots, and the
lavish display of (to say the least) unethical methods
which were being employed. We then had reason to
believe that report and are now in possession of a
signed statement that $1,000,000.00 of New York
money (as a private undertaking) was backing the
movement, and this by the declaration of one who was
actively engaged in the passage of the Ewell bill. We
were also subsequently informed by some who had ac-
tually participated in the fight against the pilots that
they had withdrawn because of the unscrupulous and
disgusting methods which were being employed by some
in support of the measure."

That a large class of persons were referred to in this
publication is perfectly manifest, and if this plaintiff
can maintain his action, it is difficult to understand
where the limitation could be put, for many persons
might allege that these libelous words were spoken of
and concerning each of them. Unless the plaintiff can
also aver some facts or circumstances from which it can
be fairly inferred that he had so acted in pursuance of
his honest purposes as a former and prospective member
of the General Assembly that persons reading the article

would conclude therefrom that he was thereby accused of co-operating and conspiring with the iniquitous class of rich men, political tricksters and bootleggers against whom the imputations are directly made, he has not alleged a cause of action. The plaintiff insistently relies upon the allegation of the declaration, that the words were spoken of and concerning him; but this is a necessary formal allegation in all such actions. If the actionable publication itself shows that the plaintiff was referred to, then no further proof on this point is necessary, but if the publication does not show that it pointed to the plaintiff, and there is nothing in the particular averments of the contemporaneous facts which connect such libelous publication with the plaintiff, the count is clearly insufficient. If it were otherwise, any plaintiff could thus adopt and apply to himself any libelous matter and sue therefor. A plaintiff cannot by this formal allegation extend the meaning of the words so as to make them applicable to himself, unless the language, by fair interpretation aided by innuendo, shows that it was in fact applicable to him.

The precise question was presented in *Lynch* v. *Kirby,* 74 Misc. Rep. 266, 131 N. Y. Supp. 680. There the defendants, who were officers and directors of the National Association of Manufacturers of the United States, had passed and published a resolution, which reads:

"Whereas, the long-continued, cowardly, and recklessly illegal determination of the International Typographical Union to destroy the business of the Los Angeles Times and the influence of its owner, Gen. Harrison Gray Otis, in his efforts in behalf of the principles of industrial freedom, has terminated in the destruction of the Times plant and building by dynamite, the murder of more than a score of employees of the paper, and the injury of many others; and whereas, the

plot contemplated the simultaneous destruction of the homes of Gen. Otis and F. J. Zeehandelaar, at no matter what sacrifice of life: Therefore, be it resolved, that this board recognizes this act of destruction of life and property as in line with the general policy of criminal unionism as exemplified by innumerable cases of resort to the use of dynamite to enforce its doctrine of rule or ruin, and that it places the responsibility therefor, not alone upon the human tools who actually perpetrated the crime, but in due proportion, upon those who in any manner foster an organization whose line of conduct leads to such results."

The action was brought by the plaintiff, who was president of the International Typographical Union of North America. The defendants demurred to the complaint upon the ground that it did not state facts sufficient to constitute a cause of action. The court sustained the demurrer, and in the opinion used this language: "I fail to find, either from a reading of the resolution complained of or of the allegations of the complaint, anything that would warrant this court in finding that the plaintiff, as an individual, is referred to in the resolution, or that the same had any reference to the plaintiff as an individual or as an officer of the corporation. It has been repeatedly held that the mere allegation in the complaint that the libel had reference to the plaintiff in itself is not sufficient, unless some fact is alleged to show that the article was intended to refer to the plaintiff. *Fleischmann* v. *Bennett,* 87 N. Y. 231; *Corr* v. *Sun Printing Co.,* 177 N. Y. 131, 69 N. E. 288. The article complained of by the plaintiff fails to bear out the allegations of the complaint that the same was spoken of and concerning him. It referred to the union of which the plaintiff was an officer, and the mere fact that he was such officer cannot be

construed to mean that he fostered such organization for the purpose of committing the crime referred to in the resolution."

[7] The same rule was recognized in *Argabright* v. *Jones*, 46 W. Va. 144, 32 S. E. 995, in which it is said that "the vice found in each one of these counts consists in the fact that the pleader misconstrued and misinterpreted the language used in the article upon which the suit is predicated. In the first place the publication lacks certainty as to the person alleged to have been defamed;" and cites 13 Am. & Eng. Ency. Law, 391, to this effect: "The defamatory words must refer to some ascertained or ascertainable person, and that person must be the plaintiff. If the words used really contain no reflection on any particular individual, no averment or innuendo can make them defamatory. An innuendo cannot make the person certain which was uncertain before." Odgers, Libel & Slander, 127, states the same rule.

This is only another way of expressing what is fundamental—that is, that in order to sustain the action the words of the publication (not the words of the plaintiff interpreting the publication) must contain the imputation against the plaintiff, or he cannot maintain his action. If, however, the publication does in fact contain such a personal imputation against the plaintiff, then no artful obscurity in the form of its expression will be allowed to defeat the plaintiff's right of action, *Moss* v. *Harwood*, 102 Va. 389, 46 S. E. 385; *Irvine* v. *Barrett*, 119 Va. 589, 89 S. E. 904, Ann Cas. 1917C, 62.

[8] The words sued on, fairly construed, do not point directly to the plaintiff individually, nor to him as a member of a group or class. There is no averment of fact from which it can be fairly inferred that the libelous matter was written and printed of him, supplemented as they are by the averments of the declaration,

and if the words fairly construed and so supplemented do not in fact point to the plaintiff, he cannot extend their meaning. It is the words published which are actionable.

We are clear that here the plaintiff fails to show by any circumstantial allegation of fact that he was, or could have been, by any one else supposed to be, a member of any group or class to whom moral turpitude was imputed by the publication.

We agree with the learned judge of the trial court (Hon. Allan R. Hanckel), who has thus clearly expressed his conclusions:

"In this case there is, in my opinion, nothing in the publication that can be fairly imputed to the defendant as an attack upon the plaintiff. Analyzed it says that there is a plot on foot to destroy the pilots and to follow that with a wholesale importation of whiskey and dope; that it is the purpose of several unscrupulous rich men to lower the personnel of the Pilots Association so as to make it possible to smuggle in whiskey and dope; that there is a political scheme on foot to establish a State machine; that they had been informed that New York money was backing the fight against the pilots, and winding up with a caution to the voters of Norfolk city not to be made tools of to destroy the Pilot's Association.

"As the words used are to be taken in their ordinary sense, and as they would naturally be understood by those reading this publication; and as innuendoes cannot extend the meaning of words beyond their natural import, but can only serve to explain some matter already expressed, it seems to me to be clear that the publication cannot be made to apply to the plaintiff here; and for that reason I will sustain the demurrer to the second count in the declaration, and overrule the motion to strike out the special plea."

*Affirmed.*