**Kevin Brian FORNSHILL, Plaintiff,**

v.

**Christopher W. RUDDY, et al., Defendants.**

**Civ. A. No. AW 94–2723.**

United States District Court, D. Maryland, Southern Division.

July 24, 1995.

Philip Matthew Stinson, Sr., Bochetto & Lentz, Philadelphia, PA, for Kevin Brian Fornshill.

James E. McCollum, Jr., College Park, MD, Michael E. Geltner, Law Office, Washington, DC, for Christopher W. Ruddy, James Dale Davidson, Agora, Inc., and Western Center for Journalism.

## MEMORANDUM OPINION

WILLIAMS, District Judge.

Plaintiff Kevin Fornshill ("Fornshill"), a resident of the Commonwealth of Virginia, brought this action against Defendants alleging defamation. Defendant Christopher W. Ruddy ("Ruddy") is a resident of New York. Defendant James Dale Davidson, editor of *Strategic Investment,* is a resident of Maryland. Defendant Agora, Inc., a Maryland

Corporation, publishes *Strategic Investment,* and is a limited partner of Strategic Investment LLC, the owner of Strategic Investment. Defendant Western Center for Journalism is a California non-profit corporation. The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

This action stems from a report on the suicide death of deputy White House Counsel Vincent W. Foster. Plaintiff, a patrol officer of the United States Park Police, discovered Foster's body at Fort Marcy Park, a national park in McLean, Virginia. The Virginia medical examiner, Dr. James Beyer, performed an autopsy and concluded that Foster committed suicide. Plaintiff alleges that Ruddy defamed him in a special report on Foster's death which indicated that Foster did not commit suicide. He further alleges that Strategic Investment, in its newsletter, and Western Center for Journalism, via a *New York Times* advertisement defamed him.

## FACTUAL BACKGROUND

Fornshill is one of six hundred and fifty United States Park Police. Of those, four hundred and thirty are assigned to the Washington, D.C. metropolitan area. On July 20, 1993 while engaged in his Park Police duties, Fornshill discovered the body of deputy White House Counsel Vincent W. Foster in Ft. Marcy Park, McLean, Virginia. On January 19, 1994, United States Attorney General, Janet Reno, appointed Robert B. Fiske, Jr., Esquire as independent counsel to investigate matters relating to Foster's death and the U.S. Park Police's subsequent investigation. Reno also assigned Special Agents of the Federal Bureau of Investigation ("Special Agents") to assist in Fiske's investigation of Foster's death.

On April 27, 1994, the Special Agents interviewed Fornshill. On June 30, 1994, Fiske issued a written report regarding the conclusions of his investigation. In the report, Fiske concluded that (1) Fornshill discovered Foster's body in Fort Marcy Park; (2) Foster committed suicide; (3) Foster died in Fort Marcy Park at the location where Fornshill discovered the body; (4) Foster,

more likely than not, owned the gun found in his hand after his death.

In the interim, on June 21, 1994, the United States Senate passed Resolution 229 instructing the Senate Committee on Banking, Housing and Urban Affairs ("Committee") to conduct a hearing into whether improper conduct occurred regarding the Park Police investigation of Foster's death. On July 12, 1994, Special Counsel to the Committee deposed Fornshill. The Committee subsequently issued a written report concurring with Fiske's conclusions.

### The Ruddy Report

On or about July 19, 1994, Defendant Ruddy published a document entitled "A Special Report on the Fiske Investigation of the Death of Vincent W. Foster, Jr." (hereinafter "Ruddy Report" or "Report"). Immediately following the title page is a map of Fort Marcy Park. On it, Ruddy marks two locations central to the Report. One he labels as "body was found here." The other he labels as "police claim body was found here."

The page preceding the actual Report provides

[a]s a reporter for the New York Post, I authored a series of articles on the death investigation of Vincent Foster, former deputy White House Counsel.

Since the release of the Fiske report of June 30, 1994 on the Foster death investigation, I have received a number of requests for comment. Herein, lies my detailed analysis. I have chosen to produce this information in this manner since a newspaper format would be inappropriate, and the pending hearings make this information timely and important.

Ruddy introduces the Report with a direct quote from Foster:

[s]tretch your talents, grasp beyond the closest branch, take a risk, stick your neck out, speak your mind, challenge the status quo and conventional wisdom. Do not just accept responsibility. Chase it down.[1]

The Ruddy Report then divides into five sections: (1) "The Cover–Up" (pp. 1–9); (2)

"Fiske and the Truth" (pp. 9–11); (3) "The Cornerstone of the Investigation" (pp. 11–13); (4) "Other Problems in Fiske's Findings" (pp. 13–16); and, (5) "Obstruction of Justice" (pp. 16–19). In the section entitled "The Cover–Up," Ruddy introduces the reader to Sgt. George Gonzalez, a lead paramedic who was on duty the night of Foster's death. Ruddy describes information that he received from Gonzalez and concludes that "little did he [Gonzalez] know that fate would make him privy to one of the biggest cover-ups in American history." (Ruddy Report, p. 1). Ruddy also concludes that the Park Police participated in the cover-up by "changing the location [of the spot where Foster's body was found], in their official reports, by several hundred feet." (Ruddy Report, p. 1). Ruddy describes how Gonzalez, six months after Foster's death, detailed the circumstances to him. He again concludes that there was a cover-up as he believes that Gonzalez's report to him was unrehearsed, comprehensive, accurate and honest.

After he introduces the reader to Gonzalez and what he believes is the honest account of where and in what condition Foster's body was found, Ruddy compares Gonzalez's report with the Fiske report. For the first time, the reader is introduced to Officer Fornshill. In describing the areas in which the two reports are in agreement, Ruddy writes "Gonzalez's paramedic unit, consisting of himself and two other rescue workers, arrived at the parking lot of Fort Marcy Park, followed closely by Officer Kevin Fornshill." (Ruddy Report, p. 2). He goes on to write "[t]he rescuers quickly separated in the lot: Gonzalez, Fornshill and Todd Hall of Gonzalez's unit, took a looping northeast trail of the park." *Id.* Finally, in writing about the areas in which his report agrees with Fiske's, Ruddy writes "[h]ere in the fort, there are two cannons, and Gonzalez came upon the first one and searched to the left of it, while Fornshill and Hall probed on the other side of the clearing." (Ruddy Report, p. 3).

---

**1.** Ruddy took the quote from a commencement address Foster delivered at the University of Arkansas Law School on May 8, 1993.

Thereafter, Ruddy immediately describes the areas in which the two reports are in disagreement, mainly where and who discovered Foster's body. Ruddy writes

[t]he Fiske report has a significantly different version of the discovery, stating that 'Officer Fornshill was the first to arrive at the body.' ... The Fiske report has Gonzalez arriving after the two others found the body. It then states that Todd Hall probed for life signs by checking Foster's pulse. (Ruddy Report, p. 4).

Ruddy goes on to express why the Fiske report is part of the cover-up. He explains that Gonzalez even drew a map for him indicating where he found Foster's body. He remarks on how the "Park Police curiously omitted what every death investigation requires: key crime scene photographs." (Ruddy Report, p. 5).

Ruddy does not mention Officer Fornshill again until he ends his discussion on the cover-up. He argues that Fiske attempts to substantiate his report of where Foster's body was found "through Park Police Officer Fornshill and a confidential witness identified as 'CW'." (Ruddy Report, p. 8). From this point, Ruddy concludes the cover-up section by concentrating on CW's claims and a 911 call made by a park maintenance worker who spoke with CW. Ruddy quotes the 911 call for his readers. He emphasizes where the caller reported the body to have been—a different location from that reported by Fiske. He concludes "[i]f Foster's death was not a suicide, CW, by placing the body in the wrong location, would become a prime suspect for the police." (Ruddy Report, p. 9).

In the "Fiske and the Truth" section, Ruddy emphasizes that the facts surrounding Foster's death are not elusive. He reports that "over 20 Park Police and Fairfax Fire & Rescue personnel are aware of the location of the body." (Ruddy Report, p. 9). He then poses the question of why does not the Fiske report contain the truth. Readers need not ponder long, as in the very next sentence Ruddy begins to answer the question.

Ruddy first concludes that many witnesses were probably not asked about the body's location. He further writes that of those witness who were asked, "perhaps they believed that telling the truth wasn't all that important on this seemingly minor point." (Ruddy Report, p. 9). He ultimately blames Fiske for failing to take the necessary measures to ascertain the truth. In this relatively short section, Ruddy never uses Fornshill's name.

Fornshill's name is also absent from "The Cornerstone of the Investigation" section. Here, Ruddy expends his efforts on Dr. James Beyer, the Virginia medical examiner who performed Foster's autopsy. With regard to the Park Police, Ruddy writes

[t]wo critical issues—the legitimacy of the Park Police's original investigation and the integrity of the autopsy report—seriously undermine the credibility of the Fiske report on Foster's death. Despite the blatant discrepancies pointing to a cover-up, there has been, to-date, no indication that Fiske is taking any of the normal steps to resolve the case, such as exhuming the body or using subpoena power. (Ruddy Report, pp. 12–13).

The section entitled "Other Problems in Fiske's Findings" is just that. In this section, Ruddy raises questions that he believes the Fiske Report failed to address. In doing so, Ruddy questions the entire investigative process, including the Park Police's investigation. However, Ruddy never mentions Fornshill's name directly. Rather, he refers to the Park Police generally in raising questions such as "Why, despite the claim that the investigation was thorough, were not elementary investigative practices followed?" (Ruddy Report, p. 13).

Again, in his continued scrutiny of the Fiske Report, Ruddy mentions the Park Police generally in the "Obstruction of Justice" section. He begins the section by writing

Fiske pledged that in addition to examining the issue of the alleged suicide, he was going to look into the serious charge that the White House had kept the FBI out of the investigation and had assigned it instead to the far less qualified and less-experienced Park Police. (Ruddy Report, p. 16).

He concludes the section by writing

And former CID agent Gene Wheaton concurs [that Attorney General Janet Reno

and President Clinton had undue influence in keeping the FBI out of the investigation], describing the Park Police as being the 'most pliable of federal law enforcement agencies.'

When I asked the Park Police for a break down of their approximately 35 death investigations last year that were suicides, homicides or natural deaths, they could not provide that. (Ruddy Report, p. 17).

Ruddy concludes his entire report by suggesting that Fiske should not have accepted the Park Police testimony or the autopsy report at face value and without question. He questions the roles that Whitewater, Madison Guaranty and CMS played in Foster's death. He also emphasizes that "[p]erhaps [Fiske] is wrong" to conclude that none of these factors played a part in Foster's death. (Ruddy Report, pp. 17–18). He finally ends the report where he began, with a brief, although historical, description of Fort Marcy park which emphasizes his point that perhaps Foster's death was not a suicide. He writes:

In the end, we, the ordinary citizens are left at Vincent Foster's transitory resting place, Fort Marcy Park.

Fort Marcy brings us to the period of civil war when rivers of blood were spilled so that we might preserve our unique experiment in 'government, of, by and for the people'—one where justice would reign supreme and no man, no group of men, no matter how powerful or highly placed, would be above the law.

How paradoxical, how utterly tragic, then, if that tiny square of earth should now stand as a symbol of violation to that noble ideal.

On or about July 19, 1994, Ruddy mailed copies of his Report—free of charge and by United States Postal Service Priority Mail—to numerous prominent members of the media, members of Congress, and others.

### Strategic Investment Newsletter

On or about August 17, 1994, Strategic Investment republished excerpts of the Ruddy Report, announcing to its readers that the complete unabridged Report could be purchased from Strategic Investment's Baltimore location. In the article introducing the Ruddy Report, Strategic Investment reporter, John Davidson, criticizes the Fiske report. He remarks, "[l]ittle wonder he has been removed as Special Prosecutor by a 3-judge panel. His report on Foster's death does not add up. Even if heaven and earth depended on it being accepted as gospel, it won't be." (S.I., p. 1).[2]

Davidson also concludes that Fiske's report was part of a cover-up. He remarks that the Fiske Report is astonishing and writes "Fiske continued to presume that Foster was a suicide, which is doubly astonishing because Foster's death had already become an issue of controversy by the time Fiske's investigation began." (S.I., p. 8). He argues that Park Police should have investigated Foster's death as a murder, not a suicide. He goes on to describe the gun found on Foster as a " 'drop gun' of the sort normally used by professional criminals."[3] The relevant portion of an abridged version of the Report follows Davidson's introduction and reads:

Just hours later on that sweltering evening, Gonzalez, and as many as 20 other officials, would have intimate knowledge of the spot where Vincent Foster's body was found in Ft. Marcy Park—and the subsequent knowledge that the Park Police participated in a cover-up by changing the locations, in their reports, by several hundred feet.

**2.** All references to the August 17, 1994 Strategic Investment article are denoted by the abbreviation "S.I.".

**3.** Ruddy describes a drop gun as an old, nondescript and untraceable revolver that can be "dropped" by someone at a staged suicide or crime. *See* Christopher Ruddy, *Fumbling Feds Change Story on Foster 'Suicide'*, N.Y. Post, February 10, 1994, at A4.

Courts have defined a drop gun as a weapon dropped at the scene when a police officer has killed someone in the line of duty. The presence of a weapon protects the officer against accusations of killing an unarmed person.
*United States v. King*, 587 F.2d 209, 210, n. 1 (5th Cir.1979).

What Gonzalez and fellow officials know could incriminate many of the federal officials involved in investigating the death of Foster, then deputy White House Counsel. There is powerful evidence that these officials obstructed justice.

Fornshill's name does not appear anywhere in Davidson's five-page introductory remarks or in the abridged version of Ruddy's Report.

### Western Center for Journalism Advertisement

On or about August 28, 1994, Western Center for Journalism placed a full-page advertisement in the Sunday edition of the *New York Times*. A heading written in large, bold letters reads "Vincent Foster's Death: Was it a suicide?" The advertisement has five subheadings: (1) "STILL AN OPEN QUESTION"; (2) "WHAT YOU ARE ASKED TO BELIEVE"; (3) "WHY WE ALL SHOULD CARE"; (4) "WE HAVE A RIGHT TO KNOW"; and, (5) "AN INDEPENDENT PROBE IS NEEDED."

Nowhere in the advertisement does the writer use Fornshill's name. However, the section calling for an independent probe provides:

[t]he most compelling and detailed journalistic analysis, perhaps the only coherent independent review of Robert Fiske's investigation of the Foster death suggests an incomplete probe into this high-ranking federal official's death.

'A Special Report on the Fiske Investigation of the Death of Vincent Foster' by investigative reporter Christopher Ruddy raises serious questions about the professionalism and objectivity of the official probes into Foster's death. The Ruddy report also details how the Park Police began a cover-up the night Foster died.

The writer of the advertisement concludes by challenging the readers to raise their voice, register their interest and support the work of the WJC. To that end, the reader is provided with a coupon on which she can register her voice by checking the corresponding box to agree with the right to know

the full details surrounding Foster's death, request a copy of the Ruddy Report, enclose an additional donation to help WJC sponsor an independent investigation into Foster's death or all three.

### DISCUSSION

### I.

On August 31, 1994, Fornshill filed a complaint in the Circuit Court for Montgomery County, Maryland, against Ruddy, Davidson, Agora, Inc. and WJC seeking damages for libel. In the complaint, Fornshill alleges that Ruddy defamed him in the Ruddy Report by stating, "*inter alia,*" that Fornshill (1) lied about the location of Foster's body; (2) participated in a cover-up by changing the location of Foster's body; (3) obstructed justice by lying to the press and public and committing a number of federal offenses, including intentionally misleading Special Prosecutor Robert Fiske, his staff and the F.B.I.; (4) did not find the body; and (5) recreated a second crime scene by the second cannon—complete with blood stain. (Paper No. 2, p. 4). Fornshill further alleges that the remaining Defendants are as liable as Ruddy because they republished Ruddy's Report.[4] With regard to the *Strategic Investment* article, Fornshill expounds that Davidson further libeled him by suggesting that Fornshill moved Foster's body and planted the gun found with Foster's body.

On October 3, 1994, Defendants filed a notice of removal to this Court based on diversity jurisdiction and federal question. *See* 28 U.S.C. §§ 1332, 1331, 1441 and 1446. On November 4, 1994, Defendants moved the Court to dismiss Fornshill's complaint pursuant to Fed.R.Civ.P. 12(b)(6). The Court conducted a hearing in open court on the record on July 14, 1995. For the reasons set forth more clearly below, the Court will treat Defendants' motion to dismiss as one for summary judgment. Having carefully considered Defendants' motion to dismiss, opposition thereto and any oral argument there-

---

4. "Under the republication rule, one who repeats a defamatory statement is liable as the original defamer." *Reuber v. Food Chemical News, Inc.,* 925 F.2d 703, 712 (4th Cir.1991) (citations omitted).

upon, the Court will grant summary judgment to the Defendants.

## II.

A court should not dismiss a complaint unless it appears beyond doubt that the plaintiff can prove no set of facts entitling him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Faulkner Advertising Assoc. v. Nissan Motor Corp.*, 905 F.2d 769, 771–72 (4th Cir.1990). In ruling on a Rule 12(b)(6) motion, the Court must accept the complaint's allegations as true, and must liberally construe the complaint as a whole. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969); *Finlator v. Powers*, 902 F.2d 1158 (4th Cir.1990). If a motion to dismiss is supported by matters outside the pleading which the Court does not exclude, the motion shall be treated as one for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 12(b)(1), (2), (6).

Summary judgment is warranted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corporation v. Catrett*, 477 U.S. 317, 329, 106 S.Ct. 2548, 2556, 91 L.Ed.2d 265 (1986) (citations omitted). Thus, this Court's affirmative obligation is to "prevent factually unsupported claims and defenses from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

In making the summary judgment determination, the Court must examine the substantive law. The Court, in the exercise of its diversity jurisdiction, must apply the substantive law of the forum, including its choice of law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). In tort actions, Maryland applies the *lex loci delicti* doctrine which provides that courts are to determine the parties' substantive rights by the law of the state in which the alleged tort occurred. *Dersookian v. Helmick*, 256 Md. 627, 261 A.2d 472 (1970).

However, Maryland courts have yet to address the issue of multistate defamation. Here, the alleged tort occurred in multiple states as a result of the Ruddy Report's national distribution. At least one federal court faced with the multistate defamation issue relied upon the Restatement (Second) of Conflict of Laws for guidance. *See Crowley v. Fox Broadcasting Co.*, 851 F.Supp. 700, 702 (D.Md.1994). The Court agrees with that approach.

Section 150 of the Restatement provides that:

(1) The rights and liabilities that arise from defamatory matter in any one edition of a ... newspaper ... or similar aggregate communication are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties....

(2) When a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state.

Restatement (Second) of Conflict of Laws (1971 & Supp.1995).

Clearly, Virginia law governs the parties' substantive rights. Foster's death occurred in Virginia. Plaintiff is and was, at the time of the alleged defamatory publication, domiciled in Virginia. Finally, the alleged defamatory publication concerns Plaintiff in his official capacity as a United States Park Policeman employed in Virginia.

In Virginia the elements of defamation are (1) publication of (2) an actionable statement with (3) requisite intent. *See Chapin v. Knight–Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir.1993) (citing *Gazette, Inc. v. Harris*, 229 Va. 1, 325 S.E.2d 713 (1985)).

Moreover, under Virginia law, to recover for defamation, Fornshill must show that the alleged libel was published "of and concerning" him. *See Ewell v. Boutwell,* 138 Va. 402, 121 S.E. 912 (1924). This rule is not only a state law requirement but is a constitutional requirement. In *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court established that state defamation law must comport with First and Fourteenth Amendments considerations. *See New York Times,* 376 U.S. at 269, 84 S.Ct. at 720 ("libel can claim no talismanic immunity from constitutional limitations").

 However, to satisfy the "of and concerning" requirement, Fornshill need not show that the publications mentioned him by name. He may meet his burden by way of colloquium. It is enough that he show that the publication was intended to refer to him and that people who read it and knew him would understand the publication as referring to him. *See Powell v. Young,* 151 Va. 985, 144 S.E. 624, *rev'd on other grounds,* 151 Va. 985, 145 S.E. 731 (1928); *Butler v. News–Leader Co.,* 104 Va. 1, 51 S.E. 213 (1905). Yet, while a publication may mention a defamation plaintiff by name,

> the publication is not actionable, unless the allegations and supporting contemporaneous facts connect the libelous words to the plaintiff. If the rule were otherwise, any plaintiff could adopt and apply to himself any libelous matter and obtain a recovery.

*The Gazette, Inc. v. Harris,* 229 Va. 1, 37, 325 S.E.2d 713, 738 (1985) (citing *Ewell,* 138 Va. 402, 413, 121 S.E. 912, 915 (1924)). As one court explained the "of and concerning requirement is to prevent lawsuits by those who merely complain of nonspecific statements that they believe cause them some hurt, allowing only those brought by persons who are the direct object of criticism." *Dworkin v. Hustler Magazine, Inc.,* 668 F.Supp. 1408, 1417 n. 11 (C.D.Cal.1987) (internal quotation marks and citations omitted).

 Moreover, a plaintiff's evidence that those who knew or knew of him believed the alleged defamatory publication intended to refer to him will not defeat a substantive

motion to dispose of plaintiff's action when the alleged defamatory publication consists of impersonal criticisms of government. *See Rosenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). "Criticism of government is at the very center of the constitutionally protected area of free discussion. Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized." *Id.* at 85, 86 S.Ct. at 675; *also see, New York Times,* 376 U.S. at 288–92, 84 S.Ct. at 729–32.

 Generally, the question of whether a publication is of and concerning a defamation plaintiff is a matter for the jury to decide. *See The Gazette, Inc. v. Harris,* 229 Va. 1, 325 S.E.2d 713 (1985). However, in the face of a motion for summary judgment a defamation Plaintiff must do more than argue that the "of and concerning" question is a jury question. He must present evidence capable of supporting a triable issue that the alleged defamatory publications were of and concerning him. Fed.R.Civ. 56(e); *see generally, Rosenblatt,* 383 U.S. at 75, 86 S.Ct. at 669. To hold otherwise would suggest that the "of and concerning" requirement is not a true element of defamation. With these principles in mind, the Court now examines the alleged defamatory publications.

### *The Ruddy Report*

 The Ruddy Report is the linchpin to Fornshill's claims against all of the Defendants. Fornshill must demonstrate a triable issue that the Ruddy Report is of and concerning him. He maintains that the Ruddy Report defamed him by inferring that he did not find Foster's body; participated in cover-up by changing and lying about the location of Foster's body; obstructed justice; and, recreated a second crime scene. Fornshill urges that he was the only Park Police officer who Ruddy mentions by name and who was on the location of the death scene during the first hour after officials arrived. He reasons that because he was the first officer on the scene, it is clear that the Report is of and concerning him and that Ruddy's readers could so assume. He also notes that he was one of only two Park Police officers who

had, on orders of his superior officer, spoken at length with the press.

Fornshill concedes that if the Ruddy Report, on its face, does not show that it is of and concerning him, it is not actionable unless the allegations and supporting contemporaneous facts connect the libelous words to him. *See The Gazette, Inc. v. Harris,* 229 Va. 1, 325 S.E.2d 713 (1985) (citing *Ewell v. Boutwell,* 138 Va. 402, 413, 121 S.E. 912, 915 (1924). However, he argues that since he is one of only three Park Police who Ruddy specifically names, he is part of a small group. He reasons that as a member of the group of three, he has a cause of action for libel against the Defendants.

The Defendants posit that the Ruddy Report mentions Fornshill by name only in conjunction with parallel named-references to Fornshill in the Fiske Report. They argue that Ruddy only refers to Fornshill impersonally and in a further effort to support his critique of the Fiske Report. Defendants further argue that Ruddy intentionally and directly criticized several individuals by name regarding their participation in the investigation, but Plaintiff is not one of the individuals Ruddy specifically names.

The Court has carefully examined the Ruddy Report and the extrinsic evidence filed by the parties in a light most favorable to Fornshill. The Court concludes that there is no genuine issue of material fact of whether the Ruddy Report is of and concerning Fornshill. Examining, each statement that Fornshill alleges to be libelous and the extrinsic evidence in support thereof, Fornshill has failed to present a triable issue.

Fornshill first claims that the Ruddy Report libeled him by inferring that he did not find the body and that he changed and lied about the location of Foster's body. The relevant portion of the Ruddy Report includes a map of Fort Marcy Park. The map provides the statements "BODY WAS FOUND HERE" and "POLICE CLAIM BODY WAS FOUND HERE." Each of these statements appear above a chalk outline of a body. The Ruddy Report further provides that "the Park Police participated in a cover-up by changing the location, *in their official reports,* by several hundred feet." Ruddy Report, p. 1 (emphasis added).

Neither of these statements specifically refer to plaintiff. Rather, Ruddy makes inferences regarding the Park Police in general. The extrinsic evidence shows that while Fornshill was the first to discover the body, other members of the search team were on the death scene within a matter of seconds. Moreover, Ruddy claims that the Park Police changed the location of Foster's body in their official reports. It is undisputed that Fornshill never completed, signed or otherwise assisted in the preparation of any Park Police reports regarding Foster's death.

Second, Fornshill claims that the Ruddy Report libeled him by suggesting that he obstructed justice. The relevant portion of the Ruddy Report provides that

[w]hat Gonzalez and his fellow officials know could incriminate many of *the federal officials involved in investigating the death of Foster....* There is powerful evidence that these officials obstructed justice by:

—issuing false reports;

—lying to the press and public;

—committing a number of other federal offenses, including intentionally misleading Special Prosecutor Robert Fiske, his staff—and the FBI.

Ruddy Report, p. 1 (emphasis added). Here, Ruddy clearly distinguishes between those who participated in the search efforts for Foster's body and those who subsequently investigated Foster's death. Even assuming, *arguendo,* that this is a statement of fact instead of opinion, the investigating officials extend far beyond the members of the United States Park Police. *See Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 19–20, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1 (1990) (opinion statements, defamatory or otherwise, are not actionable unless they contain provably true or false factual connotations); *Chapin v. Greve,* 787 F.Supp. 557 (E.D.Va.1992). Again, it is undisputed that Fornshill did not sign, complete or otherwise participate in the preparation of any reports regarding Foster's death.

Fornshill's claim that the Ruddy Report libeled him by inferring that he recreated a second crime scene is also not supported by the evidence. The Ruddy Report specifically provides

> [t]he truth is that Foster's body was on top of grass on the berm by the first cannon. It left a residue of blood on the grass. The Park Police changed the location of the body in their official report. Furthermore, *someone* re-created a second crime scene by the second cannon—complete with blood stain.

Ruddy Report, p. 7 (emphasis added). This statement appears in the midst of Ruddy's critique between the Fiske Report and what Ruddy claims Gonzalez reported to him—that he found Foster's body by the second, as opposed to the first, cannon. He compares the differences and suggests that "Gonzalez flip-flopped. Which version is true?"

In a further effort to support his theory, Ruddy criticizes the Park Police's failure "to take a 'crucial crime scene photograph.'" *Id.* at 5. With regard to Fornshill, Ruddy argues "[t]he Fiske Report has a significantly different version of the discovery, stating that 'Officer Fornshill was the first to arrive at the body.'" *Id.* at 4.

Even in reading this statement in Fornshill's favor, the Court does not find a triable issue as to whether it is of and concerning him. The extrinsic evidence provides that Fornshill was on the death scene for less than ten minutes. He left as soon as the investigating officer relieved him and did not return until months later when he conducted an interview with a Japanese television station. Moreover, Fornshill never touched the body or moved any bush surrounding the body. The closest he ever came to the body was approximately five feet.

Fornshill had no further connection with the death scene or subsequent reports. He never exchanged any information with any other Park Police officers because he had none to exchange. He was not a trained investigator; he was not a detective; he had never directly investigated a homicide or a death of any type; and, he was not medically trained to determine if someone was alive or dead.

The Court has found nothing in the Ruddy Report or in any of the extrinsic evidence which creates a factual issue that the Ruddy Report was of and concerning Fornshill. Under the summary judgment standard Fornshill must create a genuine issue of material fact which merits a trial of this matter. He has not done so.

Even more revealing is Fornshill's failure to respond to Ruddy's sworn affidavit disclaiming that the Ruddy Report is of and concerning Fornshill. Despite the passage of time, Fornshill has not filed one counter affidavit, including his own, confirming that people who read the Ruddy Report and knew him believed that the Report was of and concerning him. The most that Fornshill provides is that

> [n]umerous people who know [him], including members of the Park Police, have inquired of [him] as to whether the allegations in the Ruddy Report regarding conduct of members of the United States Park Police on the Foster death scene are true.

Fornshill Affidavit, ¶ 5.

Again, in order to create a triable issue Fornshill had to provide extrinsic evidence rebutting Ruddy's affidavit. He has not done so. None of the supporting contemporaneous facts connect the libelous words to Fornshill. Accordingly, the Court will grant Defendant Ruddy's motion for summary judgment.

### Strategic Investment Article

■ Fornshill argues that Davidson libeled him in the *Strategic Investment* newsletter by suggesting that Fornshill planted a drop gun on Foster's body and participated in a cover-up. He urges that while Davidson never specifically mentions Fornshill by name, it is clear that, when read contemporaneously with the Ruddy Report, Davidson is referring to Fornshill.

The Defendants counter by arguing that it is not proper to refer to another writing to render the newsletter libelous. *See Conroy v. Kilzer*, 789 F.Supp. 1457 (D.Minn.1992); *Stevens v. Tillman*, 661 F.Supp. 702, 708 (N.D.Ill.1986). Defendants argue that even when reading the newsletter contemporane-

ously with the Ruddy Report, there are no libelous statements in the newsletter that could possibly refer to Fornshill.

The Defendants contend that there is no indication in the Ruddy Report that Fornshill arrived at the scene or knew of the location of Foster's body prior to his participation in the search. They further contend that the Ruddy Report suggests that Gonzalez was the first to find Foster's body. Finally, Defendants posit that the only reference of the existence of a drop gun in the Ruddy Report is when Ruddy suggests that CW's testimony, the confidential eyewitness, is unreliable.

The Court agrees that the *Strategic Investment* newsletter is not libelous. The entire newsletter is essentially a criticism of Fiske's investigation. For instance, Davidson writes "[Fiske's] investigation was no investigation at all, merely a re-statement of a foregone conclusion. A cover-up." S.I., p. 7. With regard to the drop gun theory, Davidson writes

> "[t]he gun itself was untraceable, an antique Colt made up of pieces assembled from other guns. It could not be identified as having ever been in Foster's possession. Yet neither the Park Police nor the Special Prosecutor appear to have been troubled by blandly assuming that a senior White House lawyer was in possession of an unregistered 'drop gun' of the sort normally used by professional criminals."

S.I., pp. 8–9. Davidson also asserts that "CW claimed there was no gun in Foster's hand when he found him." *Id.* Prior to this statement, Davidson discusses "the Arkansas suicides" and describes them as "mysterious deaths."

Davidson's very statement suggests that a professional criminal, as opposed to any member of the Park Police, planted the alleged drop gun. The fact that he contends that the Park Police should have been troubled argues against a theory that he is referring to Fornshill as the person who planted the alleged drop gun. Since there are no specific references to Fornshill in the newsletter, he had a duty to show, by colloquium, that the newsletter was of and concerning him. He has filed nothing by way of extrin-

sic evidence that creates any genuine issue of material fact on this issue.

The Court has previously concluded that the Ruddy Report is not of and concerning Fornshill. Thus, the Court cannot hold Davidson liable for republication of the Ruddy Report. *See Reuber v. Food Chemical News, Inc.*, 925 F.2d 703, 712 (4th Cir.1991) (citations omitted). As such, Fornshill lacks a basis for liability against Strategic Investment, Davidson or Agora, Inc. and the Court must grant summary judgment to these Defendants.

**WJC Advertisement**

Fornshill claims that the WJC advertisement is libelous in and of itself. However, Fornshill did not provide the Court with any statement which he believes libeled him. Instead, he maintains that even if a jury determined that the advertisement itself is not libelous, when read contemporaneously with the Ruddy Report it becomes libelous.

The Defendants contend that at the time of the complaint, WJC had not distributed any Ruddy Reports. *See* Farah Declaration. They urge that WJC's liability must depend exclusively on the advertisement which makes no reference to Fornshill.

The Court has concluded that the Ruddy Report is not of and concerning Fornshill. Thus, Fornshill had to create a triable issue, assuming, arguendo, the advertisement is libelous, that it is of and concerning him. Fornshill has not met his burden.

The advertisement is mainly a criticism of Fiske's handling of the investigation into Foster's death, to include criticisms of the Park Police investigation. WJC does nothing more than raise a series of questions about Foster's death and describes to the readers what they can expect from the Ruddy Report. Accordingly, the Court will grant summary judgment to Defendant WJC.

The parties have raised several other issues including whether Fornshill is a public official, whether the Ruddy Report is fact or opinion and whether the fair report privilege is applicable. In light of the Court's ruling that Fornshill has not created a genuine issue of material fact as to whether the al-

leged defamatory publications are of and concerning him, the Court will decline to address those issues.

### CONCLUSION

To withstand Defendants' motion for summary judgment, Fornshill had an obligation to create a triable issue of material fact with respect to each element of his defamation cause of action. Since he has failed to do so, the Court has an affirmative obligation to prevent this matter from proceeding to trial by summarily granting judgment to the Defendants. The Court believes that summary judgment is especially important under these circumstances. Where the cost of defending a protracted lawsuit threatens to chill First Amendment rights, courts must carefully scrutinize the pleadings and grant summary judgment in favor of the defamation defendant where appropriate. *See, New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Accordingly, the Court will issue an order granting Defendants' motion for summary judgment and directing the clerk of the court to close this case.

### ORDER

For the reasons set forth in the attached Memorandum Opinion, IT IS this 24th day of July, 1995, by the United States District Court for the District of Maryland, Southern Division, hereby **ORDERED:**

1. That Defendant's Motion to Dismiss, which the Court has treated as a Motion for Summary Judgment, **BE,** and the same hereby IS, **GRANTED;**

2. That the Clerk of the Court **CLOSE** this case;

3. That the Clerk of the Court mail a copy of this Order to all parties of record.