Merle W. DAMERON, Appellant,

v.

WASHINGTON MAGAZINE, INC., et al.

Merle W. DAMERON

v.

WASHINGTON MAGAZINE, INC., et al., Appellants.

Nos. 84–5056, 84–5082.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 29, 1984.

Decided Dec. 24, 1985.

Sally A. Buckman, with whom Timothy M. Biddle, Washington, D.C., was on brief, for appellant in No. 84–5056 and cross-appellee in No. 84–5082.

Peter F. Axelrad, with whom David E. Beller, William L. Reynolds, Baltimore, Md., and Michael H. McConihe, Washington, D.C., were on brief, for appellees in No. 84–5056 and cross-appellants in No. 84–5082.

Before ROBINSON, Chief Judge, WRIGHT and MIKVA, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge.

Plaintiff Merle Dameron appeals from the district court's grant of summary judgment to the defendant in this defamation action. We agree with the district court's conclusion that the alleged libel was protected, but differ on the basis for such protection. The district court found that the defendants' statements about Dameron derived from an official report of a government proceeding. We do not believe the official report privilege applies in the circumstances of this case. However, we find that Dameron's role in a major public occurrence resulted in his becoming an involuntary, limited-purpose public figure. Under the controlling precedents, this status also forms a basis for protection, at least in the absence of actual malice by the alleged defamer. Accordingly, we affirm the court's grant of summary judgment.

## I. BACKGROUND

This case arises from *The Washingtonian* magazine's publication in October 1982 of a lengthy article entitled "The Inside Story of the Crash of Air Florida's Flight 90: A False Feeling of Security." As the title suggests, the article was primarily a dramatic account of a much-publicized 1982 airplane crash in Washington, D.C. (replete with details of what the doomed passengers said to loved ones before leaving home for the airport, what jokes were exchanged in the cockpit before take-off, and so on).

Interwoven with the narrative account of the crash of Flight 90 were a number of sidebars that reported on aviation safety and air crashes in general. These reports included "How Dangerous Is It to Fly in Bad Weather?" and "Jet Airliners Are Almost Perfect Machines Until...." The present suit is based on a two-sentence paragraph on the eleventh page of the article in a short sidebar entitled "Is National Airport an Accident Waiting to Happen?"

This section detailed safety problems specific to Washington's National Airport—the unusually large number of flights daily, its excessively short runways, the requirement that pilots avoid the air space around the White House—but concluded that the FAA had taken a number of special precautions with respect to National and that National's safety record

was good. The sidebar concluded with a few paragraphs designed to put National's problems in context. The report noted that in recent years airport facilities have very rarely played any role in crashes. ("[A]irport inadequacies were partially to blame in only 6 percent of all fatal accidents.") The article also reported that the air-traffic-control system is rarely to blame in accidents. The section explained that in 1956, inadequate air-traffic control caused a major in-air crash over the Grand Canyon, and that this debacle resulted in the FAA's creation and the present air-traffic-control system. The section concluded with the following two sentences:

> Since then—despite hair-raising talk among controllers about computer malfunctions, fatigue-induced errors, and reports of "near misses" in mid-air—it is believed that no major crash has been caused solely by controller errors. They have been assigned partial blame in a few accidents, including the 1974 crash of a TWA 727 into Mt. Weather in Virginia upon approach to Dulles (92 fatalities), the 1977 Southern Airways crash in Georgia, and the 1978 collision of a Pacific Southwest Airlines jet with a light plane over San Diego (142 fatalities).

Plaintiff Merle Dameron was the sole air traffic controller on duty at Dulles on the day the TWA plane crashed into Mt. Weather in 1974. He contends that he was not in fact to blame for the accident, that he was never found blameworthy, and that he was wholly exonerated by a federal district court, which dismissed tort claims brought against the government on the theory of controller negligence. Dameron asserts that *The Washingtonian's* statement that he was partly to blame for the death of 92 people libels him—that the statement is false, brings him into disrepute, and has caused him humiliation and mental anguish. He does not allege malice.

It appears that the researcher for this report (defendant Daniel Rapoport) had only one source for his information on the Mt. Weather crash: a 1974 National Trans-portation Safety Board ("NTSB") accident report. *See National Transportation Safety Board Aircraft Accident Report: Trans World Airlines, Inc., Boeing 727-231 N54320, Berryville, Virginia, December 1, 1974, Report No. NTSB-AAR-75-16, reprinted in* Record Excerpts ("R.E.") at 79–133. In preparing material for the article's author, Rapoport summarized the NTSB report by stating that the Mt. Weather crash was an incident in which "air control failures" were "one of the causes or a contributing factor." Exhibit H, *reprinted in* R.E. at 232. When the article's author (defendant Larry Van Dyne) incorporated this material in the article, he made what he apparently thought was a purely stylistic change and wrote that the *controllers* had been partly to blame. Rapoport subsequently edited the article but did not object to the change.

Shortly after the article appeared, Dameron notified *The Washingtonian* that it had made a mistake, and the magazine printed a correction. Subsequently, Dameron filed suit in District of Columbia Superior Court. The defendants—the magazine (Washington Magazine, Inc. publishes *The Washingtonian*), Van Dyne, and Rapoport—removed the case to federal court. (A fourth defendant, another researcher, was dismissed from the suit based on *The Washingtonian's* assertion that he had not worked on the challenged section of the article.) The defendants now contend that they printed the correction only in an effort to appease Dameron and not out of any belief they had made an error. They assert that the statement printed is substantially, if not precisely, accurate.

The defendants moved for summary judgment on a variety of grounds, including the fair report privilege, the substantial truth of the statement, and the theory that the plaintiff was both a public official and a public figure and that consequently his failure to allege actual malice rendered his suit legally deficient. The district judge granted the defendants' motion. He found that the allegedly libelous statement was protected by the common law conditional privi-

lege for press reports of government proceedings. *See Dameron v. Washington Magazine, Inc.,* 575 F.Supp. 1575 (D.D.C. 1983). In apparent anticipation of an appeal, the judge further found that Dameron was neither a public figure nor a public official and that if the report privilege did not apply there would be a question of fact as to whether the defendants had acted negligently. *See id.* at 1576–77 & n.1. We turn now to examine the basis of the district court's decision and the doctrine that in fact shields the defendants from liability.

## II. THE FAIR REPORT PRIVILEGE

█] The district court's grant of summary judgment was predicated on the conclusion that "the defendants enjoyed a conditional privilege to publish reports of governmental proceedings." *Dameron,* 575 F.Supp. at 1577. There is no question that, as a matter of District of Columbia law, publications do enjoy a conditional fair report privilege. *See, e.g., Phillips v. Evening Star Newspaper Co.,* 424 A.2d 78, 88–90 (D.C.App.1980), *cert. denied,* 451 U.S. 989, 101 S.Ct. 2327, 68 L.Ed.2d 848 (1981); *see also* RESTATEMENT (SECOND) OF TORTS § 611. However, the district judge erred in concluding that the privilege applied to the facts of this case. The conditional immunity that applies to the publication of fair and accurate reports of official proceedings is an exception to the common law rule that one who repeats or republishes a defamation uttered by another "adopts" it as his own. " 'The basis of the privilege is the interest of the public in having information made available to it as to what occurs in official proceedings and public meetings.' " *Bufalino v. Associated Press,* 692 F.2d 266, 271 (2d Cir.1982), *cert. denied,* 462 U.S. 1111, 103 S.Ct. 2463, 77 L.Ed.2d 1340 (1983) (quoting RESTATEMENT (SECOND) OF TORTS § 611 comment *a* ). The availability of the privilege encourages the media to disseminate official records— whether verbatim or in fair summaries— without fear of liability for any false, defamatory material that they might contain. *Id.*

The privilege's underlying purpose—encouraging the dissemination of fair and accurate reports—also suggests a natural limit to its application. Thus, if the reports are " 'garbled or fragmentary to the point where a false imputation is made about the plaintiff which would not be present had a full and accurate report been made,' " *Curtis Publishing Co. v. Vaughan,* 278 F.2d 23, 29 (D.C.Cir.), *cert. denied,* 364 U.S. 822, 81 S.Ct. 57, 5 L.Ed.2d 51 (1960), (quoting HARPER & JAMES, TORTS 432–33 (1956)), or if the reports are otherwise unfair or inaccurate, the privilege does not apply and the publisher is subject to liability. The privilege is similarly unavailable where the report is written in such a manner that the average reader would be unlikely to understand the article (or the pertinent section thereof) to be a report on or summary of an official document or proceeding. It must be apparent either from specific attribution or from the overall context that the article is quoting, paraphrasing, or otherwise drawing upon official documents or proceedings. Thus, the Second Circuit has ruled that the privilege "should not be interpreted to protect unattributed, defamatory statements supported after-the-fact through a frantic search of official records," *Bufalino,* 692 F.2d at 271; and the Seventh Circuit has observed that the privilege is not properly applicable where the government record is "merely part of one's research." *Gertz v. Robert Welch, Inc.,* 680 F.2d 527, 536 (7th Cir.1982), *cert. denied,* 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983). *See also Phillips,* 424 A.2d at 89 ("two major hurdles in the privilege ... [1] fair and accurate report[ing] ... [and 2] proper attribution").

These conclusions flow readily from an understanding that the intended beneficiary of the privilege is the public, not the press. The privilege is not simply a convenient means for shielding the media from tort liability. Rather, the privilege springs from the recognition that in a democratic society, the public has both the right and the need to know what is being done and said in government—even if some of that is defamatory. The public's strong interest

in keeping abreast of public affairs, however, is not served by reports that are so minimally related to governmental proceedings that the reader would not realize that any governmental report or proceeding was being described. Nor are such interests served by inaccurate or faithless summaries of such reports.

The present situation seems to us to fall outside the scope of the privilege carved out in D.C. law. The challenged passage is part of a very brief factual piece about safety at National Airport, which in turn is part of a larger inquiry into the circumstances surrounding the crash of Flight 90. Although these topics are certainly of interest to the public, they do not relate directly to governmental proceedings. Nor is the specific reference to the Mt. Weather crash tied to any particular governmental report or proceeding. The defendants have argued that their reference to the Mt. Weather crash should qualify for the privilege as a concise summary of the official conclusions of the NTSB, as laid out in its report of the incident. We cannot agree. There are many instances where reliance on an NTSB report would immunize an article—for example, in a news story contemporaneously reporting the release of the NTSB's report—but this is not one of them. The challenged assertion is simply offered as historical fact without any indication of its source. Neither the particular sentence in which the alleged defamation appears, nor the sidebar as a whole mentions the NTSB, and nothing in the piece indicates that the statement is intended as a summary of the NTSB's official report. Although the principal article on the Air Florida crash does refer a number of times to the NTSB, we do not think these references are sufficient to indicate that the part of the sidebar at issue was summarizing conclusions of the NTSB—the two pieces are simply too unrelated, the connection between the references to the NTSB in the one and the allegedly implicit references to the NTSB in the other are simply too remote. In short, nothing in the article gives the reader any reason to believe that the allegedly defamatory statement is intended as a summary of an NTSB finding. Rather, the reader is left with the impression that the conclusion is that of the article's author based on his own research—which may or may not have included government reports. Had the author attributed the report to its source, the reader would know that he was simply being informed of the NTSB's view and could then evaluate the statement accordingly. The defamatory potential of an unattributed statement of what is apparently an accepted fact presents a far different situation.

■ We also reject the suggestion that the researcher's *actual* reliance on the NTSB's report is sufficient to qualify the resulting statement for the privilege. We think this is an example of the government report being *"merely* part of one's research" and that such a showing, although perhaps tending to demonstrate good faith, is insufficient to establish an entitlement to the protection of this particular libel defense. Allowing mere reliance to suffice would in no way advance the underlying purposes of the exception. Consequently, we conclude that the fair report privilege is inapplicable. Our resolution of this issue renders it unnecessary to decide whether the statement, if properly attributed, would have satisfied the additional requirements of fairness and accuracy.

### III. THE PUBLIC FIGURE DOCTRINE

■ The defendants also argue that the grant of summary judgment should be affirmed because Dameron is a "public figure" (as distinguished from a "public official") and consequently cannot prevail absent proof of malice. Whether the plaintiff is a public figure is a question of law to be resolved by the court. *See Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1293 n. 12 (D.C.Cir.), *cert. denied,* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980). Here, the district judge ruled that Dameron was not a public figure. It is true, as the district court held, that Dameron can not fairly be said to have "injected" himself into the controversy. This one

factor, however, is not the be-all and end-all of public figure status. Injection is not the only means by which public-figure status is achieved. Persons can become involved in public controversies and affairs without their consent or will. Air-controller Dameron, who had the misfortune to have a tragedy occur on his watch, is such a person. We conclude that Dameron did become an *in*voluntary public figure for the limited purpose of discussions of the Mt. Weather crash.

The public-figure doctrine originated in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). In that case the Supreme Court added "public figures" to the category of plaintiffs who must plead and prove actual malice to recover in a libel action. The Court indicated that public figure status could be attained "by position alone" or "by ... purposeful activity amounting to a thrusting of [one's] personality into the 'vortex' of an important public controversy," *id.* at 155, 87 S.Ct. at 1991, and that such a person normally "commanded sufficient continuing public interest and had sufficient access to the means of counter-argument to be able 'to expose through discussion the falsehood and fallacies' of the defamatory statements." *Id.* (quoting *Whitney v. California*, 274 U.S. 357, 377, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., dissenting)).

As the public figure doctrine has developed, a distinction has grown up between general and limited-purpose public figures. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351–52, 94 S.Ct. 2997, 3012–13, 41 L.Ed.2d 789 (1974). In *Waldbaum* we noted that "[f]ew people ... attain the general notoriety that would make them public figures for all purposes." *Id.* at 1296. Dameron is neither a person of general notoriety nor a person who has with "vigor and success" sought the public's attention. *Cf. Gertz*, 418 U.S. at 342, 94 S.Ct. at 3008. He is an ordinary citizen who was completely unknown to the public before the Mt. Weather crash, never sought to capitalize on the fame he achieved through the Mt. Weather crash, and never acquired any notoriety apart from the crash. Dameron is not by any means, therefore, a general-purpose public figure. However, we think the public-figure doctrine, fairly applied to the facts of this case, encompasses Mr. Dameron and raises him, involuntarily, to the status of limited-purpose public figure.

In *Waldbaum* this court set out a three-part framework for analyzing whether someone has become a limited-purpose public figure. Under this test the court must determine that there is a public controversy; ascertain that the plaintiff played a sufficiently central role in that controversy; and find that the alleged defamation was germane to the plaintiff's involvement in the controversy. *See Waldbaum* at 1296–98. Central to the second prong of the *Waldbaum* analysis is an inquiry into the plaintiff's voluntary actions that have caused him to become embroiled in a public controversy. *See also Gertz*, 418 U.S., at 345, 94 S.Ct. at 3009 ("those classed as public figures have thrust themselves to the forefront of particular public controversies"). This analysis clearly must be modified somewhat to accommodate the possibility of a potentially *involuntary* limited-purpose public figure that is presented here. We think, however, that the facts here satisfy the Supreme Court's definition of a public figure and an appropriately modified *Waldbaum* inquiry. There was indisputably a public controversy here. Nor can it be doubted that the alleged defamation was germane to the question of controller responsibility for air safety in general and the Mt. Weather crash in particular. There is no question that Dameron played a central, albeit involuntary, role in this controversy. Thus, it only remains to inquire whether Dameron's relatively passive involvement in this controversy suffices to anyway qualify him as a public figure.

As we have noted above, the *Waldbaum* framework, and its second prong's requirement of activity and injection, provides the primary and most frequent route to limited-purpose public figure status. Nevertheless, the Supreme Court has recognized

that it is possible, although difficult and rare, to become a limited-purpose public figure *involuntarily*. In *Gertz* the Supreme Court noted that it is "possible to become a public figure through no purposeful action of [one's] own" although it added that "the instances of *truly* involuntary public figures must be exceedingly rare." *Id.* at 345, 94 S.Ct. at 3009 (emphasis added). We think that within the very narrow framework represented by the facts of this case, such has been Dameron's fate. By sheer bad luck, Dameron happened to be the controller on duty at the time of the Mt. Weather crash. As in *Gertz*, Dameron "assume[d a] special prominence in the resolution of [a] public question[ ]." *Gertz* at 351, 94 S.Ct. at 3012. He became embroiled, through no desire of his own, in the ensuing controversy over the causes of the accident. He thereby became well known to the public in this one very limited connection. The numerous press reports on the Mt. Weather crash introduced by the defendants in their motion for summary judgment amply demonstrate this. Dameron's name and likeness were often used in these reports. *See* R.E. at 134–49 (reproducing articles from The Washington Post, The Star-News, UPI and the PATCO Newsletter). It was in that same very limited connection that *The Washingtonian's* brief and oblique reference to him surfaced years later.

Paradoxically, the magazine article never mentions Dameron's name or other identifying characteristics. If Dameron had not been previously linked with accounts of the tragedy, no magazine reader could tie the alleged defamation to Dameron. Indeed, it was partly *because* of the defendant's public notoriety that he was identifiable at all from the oblique reference in *The Washingtonian*.

■ There is a marked contrast between the controlling facts of this case and the facts of *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), a case Dameron claims shows that he was not a public figure. Indeed, *Firestone* buttresses our conclusion that Dameron is a

public figure for the limited purpose of discussion of the Mt. Weather crash. In *Firestone* the scion of a prominent family of industrialists was sued for divorce. The charges and countercharges in the suit were sensational and the press displayed a great deal of interest in the proceedings. The Court, however, declined to find Mrs. Firestone even a limited-purpose public figure merely because of her much-publicized divorce trial. The Court found that Mrs. Firestone's resort to the judicial process to arrange her marital affairs was, for all practical purposes, involuntary and that the controversy, if any, over her marriage and divorce was a private one. *Id.* at 454–55, 96 S.Ct. at 965–66. The Court said that "even though the marital difficulties of extremely wealthy individuals may be of interest to some portions of the reading public" a divorce proceeding was not a public controversy. *Id.* at 454, 96 S.Ct. at 965. That is, public interest in a controversy does not make a public controversy. The newsworthiness of an event is not the measuring stick for identifying public controversy. Nor is a voyeuristic interest in someone's private affairs an appropriate substitute. Dameron's situation, however, is far removed from that of Mrs. Firestone. Dameron was at the center of a controversy involving the loss of many lives in a mishap involving a public carrier. At issue was the management of a program administered by the FAA, an arm of the government. Another governmental agency—the NTSB—conducted an extensive, public investigation into the events surrounding the Mt. Weather Crash. Dameron appeared at these hearings and testified for many hours about his role in the crash. The hearings, and Dameron's role in them, were widely publicized. We think that, like it or not, Dameron was embroiled in a public controversy.

Nor does *Wolston v. Reader's Digest Association, Inc.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979), compel a different conclusion. Dameron was a central figure, however involuntarily, in the discrete and specific public controversy with respect to which he was allegedly de-

famed—the controversy over the cause of the Mt. Weather crash. Wolston, by contrast, was not defamed with respect to the controversy in which he played a central role—his refusal to testify before a grand jury—but rather with respect to a controversy in which he played a role that was at most tangential—the investigation of Soviet espionage in general. *Id.* at 167, 99 S.Ct. at 2707.

We therefore conclude that plaintiff was an involuntary public figure for the very limited purpose of discussion of the Mt. Weather crash. We pause to emphasize, however, the limited scope of our holding. The circumstances in which an involuntary public figure is created will, we are confident, continue to be few and far between.

Because plaintiff himself contends that he is still known to the public in connection with the Mt. Weather crash and would be immediately recognized as the target of *The Washingtonian's* reference even without the use of his name, we need not consider the question whether mere lapse of time would free plaintiff from his involuntary public figure status. And because of our disposition of this issue, we need not reach the question whether the allegedly defamatory statement ought to have been ruled true as a matter of law.

The defendants have also argued to this court that the grant of summary judgment should be affirmed on the alternate ground that Dameron is a public official and therefore must prove actual malice, which he admits he cannot do, and which he did not allege. Because of our conclusion that Dameron was an involuntary, limited-purpose public figure, we need not reach this question.

### CONCLUSION

We conclude that the district judge erred in holding the fair report privilege applicable to this case, but affirm the district court's entry of summary judgment for the defendants on the basis of our finding that plaintiff was an involuntary public figure,

and plaintiff's admission that he has not pleaded and cannot prove actual malice.

*It is so ordered.*