**Ida Maxwell WELLS**

v.

**G. Gordon LIDDY.**

No. JFM–97–946.

United States District Court,
D. Maryland.

April 13, 1998.

Larry S. Greenberg, Bethesda, MD, David J. Branson, Washington, DC, for Plaintiff.

John B. Williams, Kerie L. Hook, Collier, Shannon, Rill & Scott, Washington, DC, Ty

Cobb, Hogan & Hartson, Baltimore, MD, for Defendant.

## OPINION

MOTZ, Chief Judge.

Ida Maxwell Wells has brought this defamation action against G. Gordon Liddy. Discovery has been completed, and Liddy has filed a motion for summary judgment. The motion will be granted.

## I.

The case arises from what may be characterized as a revisionist view of the break-in at the Democratic National Committee headquarters ("DNC") on June 17, 1972. Liddy is among a group of persons who dispute the conventional wisdom that the purpose of the break-in was to repair a tap on the telephone of then-DNC chairman Larry O'Brien that had been installed during an earlier burglary. Instead, Liddy and his fellow revisionists theorize that the goal of the break-in was to obtain information about a call-girl ring that was connected to the DNC. Plaintiff Wells was a secretary at the DNC. Liddy has alleged that Wells's telephone and desk were used in making assignations between visitors to the DNC and prostitutes who were members of the ring, thereby implying that Wells had a connection to the call-girl operation.

Liddy has expounded his theory on numerous occasions. Four such occasions constitute the bases for Wells's four-count complaint. Specifically, Liddy is claimed to have defamed Wells (1) in a speech given at James Madison University, (2) while making remarks during a cruise organized by a travel agent and the producer of a radio show on which he appears as a host, (3) on a website maintained by an organization known as "Accuracy in Media," and (4) during a radio broadcast on the "Don and Mike" show.[1]

### A.

The June 17, 1972 break-in, which combined with its aftermath is now referred to as "Watergate," is recognized as a defining event in our nation's history. The investigation following the capture of the burglars led to the resignation of many high ranking political officials, including President Richard M. Nixon. However, despite decades of investigation, no fully inclusive version of the events leading up to Watergate has emerged. Myriad theories have been propounded over more than twenty-five years. The most widely accepted version hypothesizes that Republican officials instructed burglars to break into the DNC in May 1972 to install wiretaps on the telephones of then-DNC Chairman Lawrence O'Brien and R. Spencer Oliver, the director of the Association of State Democratic Chairmen. Alfred Baldwin, a former FBI agent, monitored the conversations from the Howard Johnson's motel across the street. However, the device on O'Brien's phone failed, and a second break-in was ordered to repair it.[2] During that second break-in, the burglars were caught and arrested. Liddy, the confessed organizer of the burglars, and others served time in jail for their participation.

Some Watergate historians and participants, including Liddy, do not believe that this conventional theory adequately explains what occurred in 1972. In recent years on the speaking circuit, Liddy has been advancing the alternate "call-girl theory" about the Watergate break-in. In one version of that theory a woman named Cathy Dieter, also known as Heidi Rikan, ran a call-girl ring out of the Columbia Plaza building next to the DNC. According to the proponents of the theory, one of the call-girls, known as "Clout," was actually Maureen "Mo" Biner, the girlfriend and eventual wife of John Dean, counsel to President Richard Nixon.[3] Members of the DNC allegedly used the

---

1. Wells also originally asserted a fifth claim arising out of Liddy's appearance on a national television show, "Hardball," but she has voluntarily dismissed that claim.

2. Liddy also contends that Republican Campaign Director Jeb Stuart Magruder instructed him to use the second break-in to gather whatever de-

rogatory information the Democrats had about the President and other Republicans.

3. The Deans filed a defamation lawsuit against Liddy and other defendants prior to Wells's suit. That case is still pending in the U.S. District Court for the District of Columbia.

Columbia Plaza call-girl ring to entertain important visitors. According to Liddy, Wells kept a "brochure" containing about twelve photographs of the call-girls in her desk. Visitors to the DNC allegedly would stop at Wells's desk to consult the brochure and use Wells's phone to arrange assignations with the call-girls. The version of the theory espoused by Liddy suggests that the break-in took place because John Dean learned of the photographs in Wells's desk and wanted to remove the pictures to protect his girlfriend. As a result, Liddy asserts, Dean told some of the Watergate burglars to break into Wells's desk to remove the envelope containing the pictures. Liddy contends that he personally was not informed of this reason for the burglary at the time and that he operated under the assumption that the goals of the break-in were political espionage and repair of the O'Brien wiretap.

### B.

Liddy has stated that he now believes the call-girl theory correctly explains Watergate. He has admitted that he advanced the theory, in varying degrees of detail, on several occasions, including those upon which Wells bases her claims.

Suggestions of a call-girl ring at the DNC arose as early as four years after Watergate. In 1976, an investigative journalist named J. Anthony Lukas published a book entitled *Nightmare: The Underside of the Nixon Years.* In that book, Lukas discussed the possibility that DNC members, including R. Spencer Oliver, used Wells's telephone to schedule assignations with call-girls. The book states that "[s]o spicy were some of the conversations on this phone that they have given rise to unconfirmed reports that the telephone was being used for some sort of call-girl service catering to congressmen and other prominent Washingtonians." J. Anthony Lukas, *Nightmare* 201 (1976).

The call-girl theory received wider publicity in 1984, when Random House published a book by a journalist named Jim Hougan entitled *Secret Agenda: Watergate, Deep Throat and the CIA ("Secret Agenda").* Hougan discovered and publicized, for the first time, the fact that one of the burglars, Eugenio

Rolando Martinez, had been captured holding the key to Wells's desk. Hougan suggested that the actual targets of the bugging operation were the clients of the prostitutes in the Columbia Plaza Apartments, and that the actual target of the break-in was Wells's desk. *Secret Agenda* relied at least in·part on information received from Phillip *Mackin* Bailley. Bailley was an attorney who had represented several call-girls in the Columbia Plaza prostitution ring and had allegedly arranged for connections between the DNC and the call-girls to be made through R. Spencer Oliver's "personal business telephone." Bailley named his contact as "a secretary at the DNC." The *New York Times*'s review of *Secret Agenda,* written by J. Anthony Lukas, stated that Hougan's book "strongly suggests" that the secretary was Wells. Hougan's book did not allege that Mo Biner Dean was involved in the prostitution ring.

In May, 1991, Len Colodny and Robert Gettlin co-authored a book entitled *Silent Coup: The Removal of a President ("Silent Coup").* This book also put forward the call-girl theory of the Watergate break-in and first suggested that Mo Biner Dean's name (under the nickname "Clout") had appeared in an address book seized in a June 1972 arrest of Bailley. *Silent Coup* discussed in detail John Dean's interest in viewing and obtaining the materials seized from Bailley's apartment. Colodny and Gettlin also stated that Howard Hunt and two of the Watergate burglars told them that the real target of the wiretap installed in the first break-in was Wells's telephone. Furthermore, Martinez told Colodny and Gettlin that, before the second break-in, Howard Hunt had given him a DNC floor plan showing the target to be Wells's desk, along with a key to Wells's desk.

Some of the details Liddy includes in his version of the call-girl theory are not included in any of these books, but came from a conversation between Liddy and Bailley in 1990 or 1991. Bailley is the source of the information about the photographs of the call-girls, which he alleges that he took and provided to Wells. Bailley is also the only source for the· fact that the pictures of the

call-girls constituted a "brochure" for the prostitution ring which was kept in Wells's desk. Bailley pled guilty in 1972 to violations of the Mann Act, and he has a long history of mental illness and drug and alcohol addictions. His story about his own involvement in Watergate has changed several times since 1972.

Some form of the call-girl theory has been publicized by people other than Liddy several times since 1991. For example, in 1992, journalist James Rosen published an article in the *National Review* entitled "Watergate Investigated: A Re-examination of the 1972 Events that Led to President Richard Nixon's Resignation." The article reviewed *Silent Coup* and examined the theory that Wells's desk was the actual target of the investigation. The call-girl theory has also been discussed in at least two television broadcasts: the Arts and Entertainment Network's production, "The Key to Watergate," and the Geraldo Rivera production, "Now It Can Be Told."

## II.

Because the intertwining nature of the legal issues presented is a source of potential confusion, I will begin by briefly summarizing my rulings. First, I find that Louisiana law applies to Wells's nonconstitutional claims. Second, I find that the only communication relied upon by plaintiff which is capable of defamatory meaning is the speech made by Liddy at James Madison University. Third, I find that Wells is an involuntary limited purpose public figure who must prove by clear and convincing evidence that Liddy acted with actual malice in making the allegedly defamatory publications. Fourth, I find that Wells cannot meet the burden of proving that Liddy acted with malice.[4]

## III.

■ Because the alleged incidents of defamation occurred in several different states (and possibly different countries in the case of the cruise ship speech), I must decide at the outset what substantive defamation law governs Wells's claims. Maryland's conflict of law rules determine the substantive state law to be used in diversity cases. *See Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). In tort actions, Maryland follows the doctrine of "lex loci delicti," which directs application of the law of the state where the injury occurred. *See Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 511 (4th Cir.1986) (citing *Hauch v. Connor*, 295 Md. 120, 453 A.2d 1207 (1983)). "The place of the injury is the place where the injury was suffered, not where the wrongful act took place." *Id.*

■ Identifying the place of injury is somewhat problematic in a case such as this where the plaintiff does not allege concrete harm. As the Supreme Court has noted in another context, the "customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Gertz*, 418 U.S. at 350. Usually, these types of injuries are suffered by a plaintiff in her domicile because that is where her community standing and reputation exist and where she suffers any humiliation and mental anguish. Therefore, in ordinary cases it is appropriate under the lex loci doctrine presumptively to apply the substantive defamation law of the plaintiff's domicile. It is only in atypical circumstances, such as where a plaintiff's alleged injury is a loss of business opportunities in a state other than her domicile or where the plaintiff has suffered humiliation by hearing defamatory remarks about her in a state other than her domicile, that the lex loci doctrine requires application of non-domiciliary law.

Courts have chosen to apply the law of the plaintiffs domicile in cases involving multi-

---

4. I note that even if I am incorrect in my views concerning the applicability of Louisiana law and Wells's public figure status, Wells would have to prove actual malice to recover presumed and punitive damages. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349–50, 94 S.Ct. 2997, 3011–12, 41 L.Ed.2d 789 (1974). I also note that since the Watergate affair is a matter of public concern, Wells also must prove the falsity of Liddy's remarks even if she is a private plaintiff. *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777, 106 S.Ct. 1558, 1564, 89 L.Ed.2d 783 (1986).

state defamation out of convenience and necessity. *See, e.g., Fornshill v. Ruddy*, 891 F.Supp. 1062, 1069 (D.Md.1995); *Crowley v. Fox Broadcasting Co.*, 851 F.Supp. 700, 702 (D.Md.1994). The rule these courts have followed is the one adopted by the framers of the Restatement. *See* Restatement (Second) of Conflicts, § 150 (1971 & Supp.1995). Although the Restatement takes "the most significant relationship" approach to conflicts issues, the lex loci doctrine is neither so arbitrary nor so archaic that it commands any different rule. To the contrary, the rule that the law of the plaintiffs domicile presumptively applies in defamation cases is sound in principle, concordant with the concept that the law of the place of injury should govern, and consistent with the realities of a technologically advanced society in which multi-state communications are the norm. It is the rule I will follow here.

### IV.

■ To establish a defamation claim under Louisiana law, Wells must first demonstrate that Liddy published statements, of and concerning Wells, that are capable of defamatory meaning. *See, e.g., Sassone v. Elder*, 626 So.2d 345, 351 (La.1993). "Whether a particular statement is objectively capable of having a defamatory meaning is a legal issue to be decided by the court, considering that statement as a whole, the context in which it was made, and the effect it is reasonably intended to produce in the mind of the average listener." *Kosmitis v. Bailey*, 685 So.2d 1177, 1180 (La.Ct.App.1996). Only the speech made by Liddy at James Madison University, the subject of Count I of the complaint, meets the test of actionability.

### A.

■ The text involved in Count I, Liddy's speech at James Madison University, contained the following statements:

[The lookout post] looked directly down at a desk of a secretary, named Maxine Wells, and her telephone. And they had a telescopic lens camera pointed at that. And that is where the wiretap was subsequently found by the Democrats on that phone. Now why was there a wiretap on

there? And why did they go back in? ... [discussion of call-girl ring and Mo Dean] ... And [Bailley] said what happened was the way that some members of the DNC were using the call-girl ring as an asset to entertain visiting firemen. And to that end they had a manila envelope that you could open or close by wrapping a string around a wafer. And in that envelope were twelve photographs of an assortment of these girls and then one group photograph of them. And what you see is what you get. It was kept, he said, in that desk of Ida Maxine Wells. Thus, the camera all the rest of it. And what they were doing is as these people would be looking at the brochure, if you want to call it that, and making the telephone call to arrange the assignation that was being wiretapped, recorded, and photographed.

The statement "some members of the DNC were using the call-girl ring as an asset to entertain visiting firemen" defamed "some members of the DNC" by accusing them of a crime. Liddy then stated that "they," the members of the DNC, had a manila envelope containing twelve photographs of the prostitutes, and that the envelope was kept in Wells's desk. Liddy mentioned that Wells's phone had been wiretapped and that a telescopic lens camera had been pointed at Wells's desk and phone. He then said that the visitors were looking at the pictures of prostitutes and "making the telephone call to arrange the assignation that was being wiretapped, recorded and photographed." In context, that statement necessarily implies that the telephone calls were made from Wells's desk.

Liddy's statements at James Madison University are capable of defamatory meaning because they directly tie Wells to the prostitution ring. Liddy asserts that "some members of the DNC" arranged the assignations of prostitutes, but names only one member of the DNC—Wells. He also expressly states that Wells's desk held the photos of the prostitutes, that Wells's desk had been photographed, that Wells's phone had been tapped, that the visitors looked at the photos of the prostitutes at Wells's desk, and that the visitors made the telephone calls to ar-

range the prostitutes from Wells's desk. A reasonable listener could clearly conclude from Liddy's speech that Wells participated in the call-girl ring.

### B.

■ Count II involves the statements Liddy made on a cruise ship in August 1997. The only evidence that Wells has produced about these statements is Liddy's own deposition testimony. That testimony does not establish the exact nature of the statements sufficiently to demonstrate that the statements were capable of defaming Wells. At the deposition, Liddy was not even certain that he had mentioned Wells's name on the cruise ship, testifying that "I think I did." He also said that "My best recollection is that I said that the target of the second break in was a desk in the Oliver/Wells area that was assigned to one Ida Maxie Wells." Liddy's only other testimony mentioning Wells did not expressly differentiate between what he said on the boat and what he generally advances as his theory:

> Q. But did you say that to the people on the boat in August 1997, that you believe that there were pictures of prostitutes in Maxie Wells' desk?
>
> A. In the desk of Maxie Wells. I would also mention that in addition to Miss Wells having a key, Mr. Martinez had a key, Miss Kennedy had a key. Supposedly there was a key under the tray on top of the desk.

In this testimony, Liddy never answered "yes" or "no" about whether he made these statements on the boat. He used the phrase "I would also mention," which fails to establish whether or not he mentioned these facts during the cruise ship speech. Because none of the other statements that Wells points to in Liddy's deposition specifically mention her name, there is no evidence on the record establishing that Liddy made any statement about her capable of defamatory meaning.

### C.

■ Count III involves a website constructed by a group entitled "Accuracy In Media" ("AIM"). Although Wells has established that Liddy is acquainted with people

from AIM, she has presented no evidence that Liddy made any particular statements to AIM. Furthermore, the text of the website does not reflect that Liddy said anything that could be construed as defamatory. The only mention of Wells is the following:

> Not until Colodny and Gettlin wrote *Silent Coup* did Liddy realize that the true objective of this second raid was to get into the desk of Maxie Wells, Spencer Oliver's secretary, said to be the key figure in arranging dates with the call-girls. Unknown to Liddy at the time, one of the burglars carried a key to Wells' desk.

The phrase "said to be the key figure ..." seems to imply that the source was not Liddy. At best it is unclear that the statement came from Liddy. There is no further mention of Wells, her desk, or the key. While the statement on the website may be defamatory to Wells, the potentially defamatory statements cannot fairly be attributed to Liddy.

### D.

Count IV relates to the statements Liddy made on the "Don & Mike" radio show. The relevant text of the broadcast is as follows:

> And so my men were told, although I was not, that they were to go in there and, what, the telephone that was wired was not Mr. O'Brien's but was the telephone that was on the desk of a woman named Ida Maxwell, ah, Ida Maxwell Wells, I think, Ida Maxine Wells and she was a secretary to a man named R. Spencer Oliver ... Now that was the telephone that was wired and the FBI when they caught the men who 01 had sent in there, one of the men's names was Martinez and Mr. Martinez had been given, not by me, but by someone else, a map which located that desk in those suite of offices with an X on the map and it was no where near the office of Mr. O'Brien. That's the same desk that that wired telephone was on and he had been given, when he was caught he had a key with him. And the FBI found that the key fit that very desk. And he was to remove from that desk what was in there. Now, we know something else.

Ah, I don't want to get into things that are too salacious for someone your age, but . . .

Liddy went on to state that a call-girl ring had been operating out of Columbia Plaza. He also referred readers to *Silent Coup* for the rest of the story. However, he never tied the call-girl ring in with the desk and never mentioned pictures of the call-girls. The words that Liddy did say on the radio show could only be viewed as defamatory in two ways: (1) because people who already knew his theory could make the connection between the desk and the call-girl ring; and (2) because he referred people to *Silent Coup*, which contains material that may defame Wells.

 Wells contends that a statement may be defamatory if a "loyal listener" would derive a defamatory meaning from the speaker's reference. However, under Louisiana law the test is whether an "average listener" would consider the statement to be defamatory. *See Kosmitis,* 685 So.2d at 1180. Under that standard, the statements actually made by Liddy could not be construed as defamatory. In addition, Liddy's action in referring listeners to an allegedly defamatory book did not constitute independent defamation of Wells. Liddy's reference to *Silent Coup* did not republish any of the allegedly defamatory material contained within. Furthermore, the connection between Liddy's reference and Wells was at best tangential because he mentioned the book several minutes after he had last mentioned Wells's name. In short, Wells is reading into the radio broadcast something that was not there.

### V.

 I will now address the issue of whether Wells is a public figure. Initially, for conceptual clarity at least, it must be determined whether federal or state law defines who is a public figure. It seems to me that this question can be answered by reference to first principles. Since the First Amendment provides protection as to communica-

tions about matters of public concern, federal law necessarily provides the base standard for defining who is a public figure. On the other hand, since states remain free to create their own defamation law, provided they do not violate First Amendment protections, *see, e.g., Gertz,* 418 U.S. at 347–48, they may set a standard that is easier than the constitutional standard for a defendant to meet in demonstrating that a plaintiff is a public figure.[5] In other words, in defining the substantive elements of a defamation claim, states may give greater weight than the First Amendment requires to the public interest in fostering discussion of issues of public concern.

Having raised this issue, I must immediately add that it is academic if I am correct in my holding that Wells is an involuntary limited purpose public figure under the base standard established by the First Amendment. However, I recognize that there is relatively little case law defining who constitutes an involuntary public figure for First Amendment purposes, and that a reviewing court might disagree with the conclusion I have reached. If that proves to be so, the conceptual distinction I have drawn might become critical since, for the reasons I will state in section VB, *infra,* I am of the view that the courts of Louisiana would require Wells to prove that Liddy acted with actual malice.

### A.

In his opinion in *Gertz,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789, Justice Powell succeeded in bringing order to the chaos left by the five separate opinions issued by the members of the plurality in *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). One of the issues presented in *Gertz* was whether the plaintiff was a public figure. In addressing the issue, Justice Powell stated on behalf of the Court:

Respondent's characterization of petitioner as a public figure raises a different question. That designation may rest on either of two alternative bases. In some instanc-

---

**5.** Indeed, there is no principled reason why a state could not impose the burden upon a plaintiff to prove that she is not a public figure. Even in purely private defamation actions, states may raise the standards and burdens of proof as high as they deem proper. *Gertz,* 418 U.S. at 347.

es an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

418 U.S. at 351.

■ Liddy argues that Wells has "voluntarily injected" herself into the public controversy about the Watergate break-in and has thus become a limited purpose public figure by her own actions. In support of this argument, Liddy relies upon the facts that (1) Wells testified before the staff of the Senate committee that investigated Watergate, and her testimony was transcribed and published as part of the committee's report; (2) she granted an interview to investigative journalist Jim Hougan prior to his writing *Secret Agenda;* (3) she wrote a letter to the *New York Times* after the *Times* had published a book review of *Secret Agenda* highlighting Wells's role in the alleged prostitution ring; (4) she responded to a request for an interview by a journalist who wrote an article in the *Washington Post* (mentioning Wells in one line) on the twentieth anniversary of the Watergate break-in; (5) she was interviewed by the BBC in 1993 and set as a condition of the interview that she not be asked about the call-girl theory; and (6) she spoke two or three times about her career, including her job at the DNC, to another writer who told her that she was writing a book about John Mitchell and who eventually wrote an article that appeared in the *National Review.*

Liddy's argument is not persuasive. Being required to appear before a Senate committee is not voluntary at all. When writing to the *New York Times,* Wells was, like the plaintiffs in *Foretich v. Capital Cities*ABC, Inc.,* 37 F.3d 1541 (4th Cir.1994), simply taking action to defend her reputation against the onslaughts that had been made against her. On the few other occasions on which she has spoken to the media, she did not seek public attention but merely responded to requests for interviews. In no instance

has she attempted to influence the outcome of any public discussion about Watergate.

It is not necessary, however, for a plaintiff to inject herself voluntarily into a public controversy in order for her to be deemed a limited purpose public figure. In the passage from *Gertz* quoted above, the Supreme Court recognized that an individual could become a public figure for a limited range of issues by being "drawn into a particular public controversy." Elsewhere in the opinion, the court posited that "[h]ypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society." 418 U.S. at 345.

■ The present case provides one of those exceedingly rare instances. A comparable situation was presented in *Dameron v. Washington Magazine, Inc.,* 779 F.2d 736 (D.C.Cir.1985), where an air-traffic controller who had been on duty at the time of an airplane crash alleged that he had been defamed. The court recognized that *Dameron* had not "injected" himself into the controversy, but went on to observe:

> This one factor, however is not the be-all and end-all of public figure status. Injection is not the only means by which public-figure status is achieved. Persons can become involved in public controversies and affairs without their consent or will. Air-controller Dameron, who had the misfortune to have the tragedy occur on his watch, is such a person. We conclude that Dameron did become an *in* voluntary public figure for the limited purpose of discussions of the Mt. Weather crash.

779 F.2d at 740–41. Wells is in virtually the identical position. She had the misfortune to be working at the DNC at the time of the break-in; it is her desk and her telephone that have been said (by others prior to Liddy) to have been used in connection with a prostitution ring; and it was the key to her desk that was seized by an arresting officer from one of the Watergate burglars. Unfortunate though the circumstances may be, be-

fore Liddy made any of the statements allegedly defaming her, Wells had been drawn by a series of events into the Watergate controversy.

Undoubtedly, the involuntary public figure doctrine, like any other doctrine, can be subject to abuse, and its outermost limits may be difficult to define. However, as the Court in *Gertz* had the prescience to foresee, there are rare circumstances where the doctrine has applicability. Here, in my judgment, the immense public importance of the Watergate controversy and the fact that Wells stood in a path of legitimate inquiry into the reasons behind the break-in bring the case well within the doctrine's ambit.[6]

### B.

For the reasons just stated, I find that Wells is an involuntary limited purpose public figure under the base standard established by the First Amendment. I will now discuss the Louisiana cases that lead me to believe that, assuming public figure status is not required by the First Amendment, Wells nevertheless would be required to prove that Liddy acted with actual malice to obtain any recovery under Louisiana law.

The Third Circuit of the Louisiana Court of Appeals has indicated in *dictum* that the actual malice standard applies both in cases where the plaintiff is a public figure and in cases where the matter in issue is one of public concern. *Broussard v. Kaplan*, 604 So.2d 77, 83 (La.Ct.App.1992). Likewise, in *Kosmitis*, 685 So.2d at 1180, the Second Circuit of the Louisiana Court of Appeals ruled that "[i]n cases involving statements made about a public figure or a matter of public concern . . ., the plaintiff must prove actual

malice, that is that defendant either knew the statement was false or acted with general disregard for its truth." *See also Neuberger, Coerver & Goins v. Times Picayune Publishing Co.*, 597 So.2d 1179, 1182 (La.Ct.App. 1992) (stating, in passing, that "presumably" the actual malice standard "would apply to a private citizen bringing a defamation action against the media defendant on a matter of 'public concern' ").

The Louisiana Supreme Court has not expressly decided the issue. In *Romero v. Thomson Newspapers (Wisconsin), Inc.*, it did state that "[t]here is authority for applying the *New York Times* rule when an article concerns public issues, even though the plaintiff is a private person." 648 So.2d 866, 869 (La.1995). However, in support of that proposition the court cited *Rosenbloom*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296, which had been overruled by *Gertz*. Moreover, a majority of the court did not subscribe to the view, expressed by a concurring Justice, that the Louisiana constitution "incorporates the [*Rosenbloom* ] standard . . . which applies the *New York Times* actual malice test to speech of public concern regardless of the status of the plaintiff." *Romero*, 648 So.2d at 871. Thus, it cannot be said with any certainty that the Louisiana Supreme Court will ultimately adopt a general rule that private plaintiffs drawn into a matter of public controversy must meet the actual malice standard.

However, there is one indicator, albeit somewhat oblique, that the court would apply the actual malice standard in a case involving a private plaintiff and an issue of public concern where, as here, a media defendant is involved. In *Trentecosta v. Beck*, 703 So.2d 552, 560 (La.1997), the court refrained from

---

**6.** In contesting her involuntary public figure status, Wells cites *Reuber v. Food Chemical News, Inc.*, 925 F.2d 703, 709–10 (4th Cir.1991), where the Fourth Circuit, while holding that plaintiff had injected himself into a matter of public controversy, noted in passing that "even 'involuntary' participants can be public figures when they choose a course of conduct which invites public attention." In support of its statement the court cited two cases, *Clyburn v. News World Communications, Inc.*, 903 F.2d 29, 33 (D.C.Cir.1990), and *McDowell v. Paiewonsky*, 769 F.2d 942, 949–50 (3d Cir.1985), in which the courts held that the plaintiffs had injected themselves into a pub-

lic controversies in part by voluntarily undertaking a course of conduct that invited attention. Neither *Clyburn* nor *McDowell* addressed the involuntary public figure doctrine at all, and I have little doubt that the Fourth Circuit did not intend in *Reuber* to enunciate the facially nonsensical proposition that a plaintiff must always act voluntarily in order to become an involuntary public figure. Clearly, in *Gertz*, the Supreme Court recognized the possibility of the "rare instance" where a plaintiff can have limited purpose public figure status thrust upon her regardless of any voluntary actions she may have taken.

deciding "the question of whether the *Sullivan* actual malice standard or some lesser degree of fault is applicable when a private individual is injured by a defamatory communication by a non-media defendant about a matter of public interest." Although one should be hesitant to glean too much meaning from that which is only implied, it is not unreasonable to infer from this statement that the Louisiana Supreme Court considers it settled that the actual malice standard does apply in all cases involving a media defendant and a matter of public interest. *But see Sassone v. Elder,* 626 So.2d 345, 352 n. 10 (La.1993) (recognizing that *Gertz* permits but does not require application of actual malice standard in cases involving media defendants and matters of public concern, and declining to reach the issue).

In any event, I believe that even were the Louisiana Supreme Court not to adopt the actual malice standard in all such cases, it would nevertheless require Wells to prove actual malice by finding her to be an involuntary limited purpose public figure. Although there is no Louisiana case directly on point, two general considerations lead me to this view.

First, although the doctrinal analysis sometimes varies, the appellate decisions of the Louisiana courts collectively evidence a strong public policy favoring robust discussion of matters of public concern. Second, in *Broussard,* the Third Circuit of the Louisiana Court of Appeals cited *Trotter v. Jack Anderson Enterprises, Inc.,* 818 F.2d 431 (5th Cir.1987), in applying a three-step test for determining a plaintiff's limited purpose public figure status. 604 So.2d at 83. The test had originally been formulated by the District of Columbia Circuit in *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287 (D.C.Cir.1980). As summarized in *Trotter,* the three steps of the test are as follows:

(1) The controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution;

(2) Plaintiff must have more than a trivial or tangential role in the controversy; and

(3) The alleged defamation must be germane to the plaintiff's participation in the controversy.

818 F.2d at 433–34.

*Waldbaum* was decided by the same court that decided *Dameron,* 779 F.2d 736, the case mentioned above in which an air traffic controller was found to be an involuntary public figure. In *Dameron,* the D.C. Circuit recognized that the *Waldbaum* test had been enunciated in a case where the plaintiff was alleged to have injected himself into public discussion about a matter of public interest and that the second step of the test must be construed with that fact in mind. *Id.* at 741. Nevertheless, the court in *Dameron* found *Waldbaum* to be fully supportive of the conclusion that Dameron was a limited purpose public figure in light of the public importance of the controversy about the air crash, the pertinence of the alleged defamation to the controversy, and the "central, albeit, involuntary, role" he played in the controversy. *Id.* The tenor of this reasoning is consonant with the resonating theme in the Louisiana cases that vigorous public discussion of public issues must be protected. I am therefore confident that Wells would be found to be an involuntary limited purpose public figure under Louisiana law.

## VI.

 The actual malice standard is well established. It requires a plaintiff to prove either that a defendant had actual knowledge that the published defamatory statement was false or that he made the statement with reckless disregard as to its truth or falsity. *See New York Times v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964); *Gertz,* 418 U.S. at 334–36. A public figure has the burden of meeting this standard with clear and convincing evidence. *See New York Times,* 376 U.S. at 285–86; *Church of Scientology Int'l v. Daniels,* 992 F.2d 1329, 1332 (4th Cir.1993). A party's burden of proof is to be taken into account in ruling upon a summary judgment motion. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252–56, 106 S.Ct. 2505, 2512–14, 91 L.Ed.2d 202 (1986).

■ Actual malice is present where the publisher of a defamatory statement derives his information from a single unreliable source, *see, e.g., St. Amant v. Thompson,* 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968); *Harte–Hanks v. Connaughton,* 491 U.S. 657, 692–93, 109 S.Ct. 2678, 2698–99, 105 L.Ed.2d 562 (1989); *Fitzgerald v. Penthouse Int'l Ltd.,* 691 F.2d 666, 670 (4th Cir. 1982), and the focus of Wells's attack here is upon the unreliability of Phillip Mackin Bailley. The fact that Bailley is highly impeachable cannot be questioned. Indeed, Liddy volunteered during a deposition that his own lawyers have advised him that he cannot rely upon Bailley as a sole source. Bailley is a convicted felon, has a history of substance abuse and mental illness, and resisted having his deposition taken in this case on the ground of mental incompetence. Moreover, he has changed and embellished his story about the alleged connection between the DNC and a prostitution ring over time.

■ Liddy counters Wells's attack on Bailley by arguing that Bailley is not his sole source. To support this argument, he points out that Wells's role in an alleged prostitution ring had been suggested by others on at least five occasions prior to his speech at James Madison University: in *Secret Agenda* published in 1984; in a book review of *Secret Agenda* appearing in *The New York Times* in 1984; in *Silent Coup,* published in 1991; during an Arts & Entertainment Network show entitled "The Key to Watergate;" and on a Geraldo Rivera production entitled "Now It Can Be Told." Bailley alone, however, appears to have been the ultimate source for all of these publications. Lukas's book review in *The New York Times* and the two television broadcasts did not pretend to have any independent sources, and the texts of *Secret Agenda* and *Silent Coup* reflect that Bailley provided the information concerning Wells's alleged connection to the operation. Further, the summary judgment record does not reflect that anyone else claims to have personal knowledge of Wells's alleged role.[7]

That, however, is not the end of the analysis. Although Bailley's impeachability is an important element in the inquiry concerning Liddy's actual malice, it alone is not dispositive. The defamatory statement that Liddy is charged with making against Wells is that she played a role in a call-girl operation connected with the DNC.[8] If there are sufficient pieces of evidence independent of Bailley's own statements that can arguably be viewed as corroborating what Bailley says, Wells cannot meet her burden of proving by clear and convincing evidence that Liddy acted with actual malice. I believe that there are.

First, although it is true (as Wells argues) that Bailley has changed his story over time,[9] ever since 1984, when his version of the events first became public, he has consistently maintained that "a DNC secretary" played a role in fostering prostitution activities.

Second, as early as 1976 it was publicly reported that conversations over the tele-

---

7. John F. Rudy, II, the prosecutor in Bailley's criminal case, testified on deposition that an FBI agent identified a name in a coded book maintained by Bailley as a female secretary or administrative aide working at the DNC. However, subsequent to the deposition Rudy submitted an affidavit stating that he has "no personal knowledge of any call-girl related activities being carried on at the Democratic National Committee ("DNC") during 1971 or 1972, and my deposition testimony should not be construed otherwise."

8. The question of whether there is sufficient corroborating evidence to support Liddy's statements about Maureen Dean is an entirely different one that I do not reach. It remains to be decided in the suit instituted by the Deans in the United States District Court for the District of Columbia.

9. Under the version Bailley told to Jim Hougan, the author of *Secret Agenda,* there was only one prostitute (a woman named Tess) to whom Wells was referring customers from the DNC. Under a second version set forth in a book proposal Bailley made in 1986, he was the manager of four full-time prostitutes and six part-time prostitutes (including Maureen Biner and several other well-known women). According to this version, Wells was only one of eight "runners" working for Bailley at the DNC. His final version, about Wells having in her desk photographs of approximately twelve prostitutes who worked for Cathy Dieter/Heidi Rikan at the Columbia Plaza, first surfaced after Bailley's conversation with Liddy and Colodny in 1990 or 1991.

phone to which Wells and her boss, R. Spencer Oliver, had primary access were "so spicy . . . that they have given rise to unconfirmed reports that the telephone was being used for some sort of call-girl service catering to congressmen and other prominent Washingtonians." J. Anthony Lukas, *Nightmare* 201 (1976). During the ensuing twenty years, several sources have confirmed the explicit sexual and intimate nature of conversations conducted over that line.

Third, there is ample evidence on the public record (including the fact that the FBI reported finding a tap on the phone) from which it can reasonably be inferred that wiretapping the Oliver/Wells telephone was a goal of the Watergate burglars. Wells does not contest this evidence.

Fourth, there is also ample evidence—in fact, it appears to be uncontradicted—that Eugenio Rolando Martinez, one of the Watergate burglars, had a key to Wells's desk which was seized from him at the time of his arrest. This fact strongly implies that opening the desk was an object of the break-in. Wells seeks to dispel this inference by arguing that Martinez may not have brought the key with him into the DNC but instead picked it up after he entered the DNC offices. However, this argument is undercut by the fact that a picture taken of the evidence seized from the burglars showed that the key was taped to the back of a notebook.[10] Moreover, Carl Shoffler, the now-deceased arresting officer, both publicly stated and testified on deposition that at the time of this arrest, Martinez made efforts to hide the key from him. Wells attacks Shoffler's credibility, saying that the final version he told gradually emerged in its telling and was denied by Martinez. However, even if that were so, Liddy could not be said to be acting maliciously in believing Shoffler. In any event, in *Silent Coup* the authors stated that "Martinez has acknowledged to us that he was trying to get rid of the key." *Silent Coup* at 159.

Fifth, neither Wells nor anyone else has ever suggested that Wells's desk contained any sensitive political or financial data or other information in which the Watergate burglars would have been interested other than material of a sexual nature as alleged by Bailley.

Sixth, Jeannine Bailley Ball, Phillip Mackin Bailley's sister, was deposed in the *Dean* litigation on September 29, 1993 (approximately two and a half years before Liddy made his speech at James Madison University).[11] She confirmed that there was a relationship between Wells and her brother. Ball (who at the time of her deposition was serving as a lieutenant in the United States Air Force) worked in Bailley's law office in 1972. She testified that she had seen the name "Maxie Wells" written in Bailley's small notebook and that, while she was answering the telephone, Wells (identifying herself as Maxie Wells) had called and asked to speak to Bailley between ten and forty times. In contrast, in her deposition, Wells testified that she did not know whether she had ever met Bailley. She said that she did not remember his name until after the call-girl theory was publicized and a friend reminded her that Bailley had been "a sort of hanger on of the Young Democrats, somebody who appeared at parties and things like that." Wells Dep., June 7, 1996 at 46. Although this testimony appears inconsistent with the testimony of Ball, Wells's deposition was not taken until after Liddy gave his speech at James Madison University. In any event, Liddy is under no obligation to credit Wells over Ball.

Finally, early in the *Dean* litigation (years before Liddy gave his speech at James Madison University) Liddy's lawyers conducted interviews with former DNC staffers which, according to their internal correspondence, "[i]ndicated that there was knowledge within the DNC of the operation of a call-girl ring involving Spencer Oliver and Maxie Wells. Barbara Kennedy [who had worked with Wells at the DNC] told us that there were a

---

**10.** The notebook and the key are not in the archival file where they would be expected to be found. Bailley's notebooks also apparently have not been preserved.

**11.** Liddy has submitted an affidavit stating that his attorneys in the *Dean* case have kept him advised of significant developments in that case.

number of rumors following the break-in about the existence of this call-girl ring and that Wells was fired abruptly when the rumors began." Letter from John B. Williams to Stephen G. Contopulos, Esq. 3 (June 11, 1992) (Def.Rep.Mem.Exh.W). Obviously, the reliability of an otherwise unreliable source cannot be established by referring to rumors. However, taking into consideration the other items of evidence arguably confirming Bailley's allegation that Wells provided a connection for him at the DNC, the fact of the rumor (confirmed by a former employee identified by name) and Wells's discharge in its wake is at least of tangential relevance, if only because of its timing. It shows that the matters Bailley disclosed to Jim Hougan, the author of *Secret Agenda*, in or about 1984 had been discussed privately among staff members of the DNC more than a decade earlier, contemporaneously with the occurrence of the events.

Individually, none of these facts may seem to be significant. Even taken as a whole, they may fall far short of meeting an affirmative burden of proof that might have to be met in other legal contexts. But that is not the issue here. Rather, the question is whether these pieces of corroborating evidence are sufficient to prevent Wells from meeting her burden of proving, by clear and convincing evidence, that Liddy had actual knowledge that what he said about Wells in the James Madison University speech was false or that he spoke with reckless disregard as to the truth or falsity of his statements. In my judgment they are sufficient for that purpose. I will therefore enter summary judgment in favor of Liddy.

### ORDER

For the reasons stated in the opinion entered herewith, it is, this 13th day of April 1998

ORDERED that

1. Defendant's motion for summary judgment is granted; and

2. Judgment is entered in favor of defendant against plaintiff.